**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Greggory G. and Tommie S. Tank, | ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER DENYING MOTIONS** |
| | ) | **FOR INTERIM RELIEF** |
| vs. | ) | |
| | ) | |
| Burlington Resources Oil and Gas, | ) | |
| Company, LP, and Murex Petroleum | ) | |
| Corporation, | ) | |
| | ) | Case No. 4:10-cv-088 |
| Defendants. | ) | |

_____

Before the court are plaintiffs' Motions for Preliminary Injunction and Declaratory Judgment.

For the reasons set forth below, the motions are denied, but the court will consider expediting the final

resolution of this case.

I.     **BACKGROUND**

Plaintiffs own mineral interests in the NW¼ of Section 35, Township 151 North, Range 96

West, in McKenzie County, North Dakota ("Tract 1"), which they have leased to Murex Petroleum

Corporation ("Murex") (the "Murex lease").[1]  (Doc. No. 18-1).  Plaintiff Greggory Tank also has a

mineral interest in 16.667 acres of land located in the N½SE ¼ & E½SW¼ of Section 34 ("Tract 2")

(Doc. Nos 18 & 26-1), which is unleased.

Plaintiffs commenced this action in state court in November 2010, and it was removed to this

court in December 2010.  In their amended complaint, plaintiffs seek monetary and equitable relief for

_____

[1]  It will be assumed that Murex still owns or controls all of the working interest under the Murex lease.
However, there is some indication that it may have conveyed a portion of that interest to third parties. (Doc. No. 30-1,
Ex. A).

nonpayment of royalties on oil and gas production attributable to their Tract 1 and Tract 2 mineral interests, including cancellation of the Murex lease.

On February 1, 2011, plaintiffs filed the present motions for interim relief. In the motions, plaintiffs seek a preliminary injunction requiring the defendants to pay the royalties due on the production attributable to the two tracts, along with a declaration that their receipt of the royalty with respect to Tract 1 would not constitute a waiver of their claim for cancellation of the Murex lease. Since plaintiffs' claims with respect to Tracts 1 and 2 differ, the requests for temporary relief will be addressed separately.

## II.    <u>GOVERNING LAW</u>

The burden of establishing the necessity of a preliminary injunction is on the moving party. <u>Baker Elec. Co-op., Inc. v. Chaske</u>, 28 F.3d 1466, 1472 (8th Cir. 1994); <u>Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.</u>, 871 F.2d 734, 737 (8th Cir. 1989). In this case, since plaintiffs are seeking affirmative relief, the burden is substantially greater than if they sought a prohibitory injunction. <u>See</u> <u>Ferry Morse Seed Co. v. Food Corn, Inc.</u>, 729 F.2d 589, 593 (8th Cir. 1994).

In determining whether a preliminary injunction should be issued, the court is required to consider the factors set forth in <u>Dataphase Sys., Inc. v. C L Sys., Inc.</u>, 640 F.2d 109 (8th Cir. 1981) (en banc). The four <u>Dataphase</u> factors are:

> (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

<u>Id.</u> at 114; <u>see</u> <u>Rogers Group, Inc. v. City of Fayetteville, Ark.</u>, 629 F.3d 784, 787 (8th Cir. 2010).

Two North Dakota statutes are particularly relevant in this case. The first is N.D.C.C. § 47-16-39.1, which provides mineral owners with statutory remedies of 18 % interest and attorney's fees

when an "operator" fails to make timely payment of oil and gas royalties, as well as the possibility of lease cancellation when the equities require it.[2]

The second is North Dakota's "forced pooling" statute codified at N.D.C.C. § 38-08-08. This statute governs the payment of royalty on unleased acreage within a spacing unit that is subject to a pooling order. In this case, it governs the payment of royalty due on Tract 2. It would also govern the amount payable on Tract 1 if the court cancels the Murex lease.[3]

---

[2] N.D.C.C. § 47-16-39.1 reads as follows:

**§ 47-16-39.1. Obligation to pay royalties--Breach**

The obligation arising under an oil and gas lease to pay oil or gas royalties to the mineral owner or the mineral owner's assignee, or to deliver oil or gas to a purchaser to the credit of the mineral owner or the mineral owner's assignee, or to pay the market value thereof is of the essence in the lease contract, and breach of the obligation may constitute grounds for the cancellation of the lease in cases where it is determined by the court that the equities of the case require cancellation. If the operator under an oil and gas lease fails to pay oil or gas royalties to the mineral owner or the mineral owner's assignee within one hundred fifty days after oil or gas produced under the lease is marketed and cancellation of the lease is not sought or if the operator fails to pay oil or gas royalties to an unleased mineral interest owner within one hundred fifty days from initial oil or gas production from the unleased mineral interest owner's mineral interest, the operator shall pay interest on the unpaid royalties at the rate of eighteen percent per annum until paid, except that the commissioner of university and school lands may negotiate a rate to be no less than the prime rate as established by the Bank of North Dakota plus four percent per annum with a maximum of eighteen percent per annum, for unpaid royalties on minerals owned or managed by the board of university and school lands. Provided, that the operator may remit semiannually to a person entitled to royalties the aggregate of six months' monthly royalties where the aggregate amount is less than fifty dollars. The district court for the county in which the oil or gas well is located has jurisdiction over all proceedings brought pursuant to this section. The prevailing party in any proceeding brought pursuant to this section is entitled to recover any court costs and reasonable attorney's fees. This section does not apply when mineral owners or their assignees elect to take their proportionate share of production in kind, in the event of a dispute of title existing that would affect distribution of royalty payments, or when a mineral owner cannot be located after reasonable inquiry by the operator; however, the operator shall make royalty payments to those mineral owners whose title and ownership interest is not in dispute.

[3] Section 38-08-08 reads in relevant part as follows:

**§ 38-08-08. Integration of fractional tracts**

1. * * * * That portion of the production allocated to each tract included in a spacing unit covered by a pooling order must, when produced, be deemed for all purposes to have been produced from such tract by a well drilled thereon. For the purposes of this section and section 38-08-10, any unleased mineral interest pooled by virtue of this section before August 1, 2009, is entitled to a cost-free royalty interest equal to the acreage weighted average royalty interest of the leased tracts within the spacing unit, but in no event may the royalty interest of an unleased tract be less than a one-eighth interest. An unleased mineral interest pooled after July 31, 2009, is entitled to a cost-free royalty interest equal to the acreage weighted average royalty interest of the leased tracts within the spacing unit or, at the operator's election, a cost-free royalty interest of sixteen percent. The remainder of the unleased interest must be treated as a lessee or cost-bearing interest.

## III.    THE REQUEST FOR PRELIMINARY RELIEF - TRACT 1

### A.    Additional background Tract 1

Plaintiffs leased their mineral interests in Tract 1 to Murex in March 2003.  The lease was filed

for record with the McKenzie County Register of Deeds on July 2, 2003.  Pursuant to the lease, Murex

obtained the "working interest" to the oil and gas in Tract 1 and plaintiffs retained a 3/16 (18.75%)

royalty interest.  (Doc. Nos. 18, 18-1, & 19).

Tract 1 is the subject of a pooling order issued by the North Dakota Industrial Commission for

the Lassen #41-26H well ("Lassen Well").  Defendant Burlington Resources Oil and Gas Company,

LLC ("Burlington") is the well operator.[4]

Burlington acknowledges that the Lassen Well was completed on October 31, 2009, and that

oil and gas has been marketed from the well since November 2009. (Doc. No. 20).  With respect to

Tract 1, the 150-day deadline in § 47-16-39.1 for commencement of payment of royalty, before the

18% interest and the attorney's fees provisions apply, was reached at least by May 1, 2010.

Plaintiffs claim they began contacting Burlington as early as June 2010 about the status of their

royalty, but, according to them, did not receive an appropriate response.  When payment was not

forthcoming by the beginning of August, plaintiffs served Murex with a Notice of Lease Forfeiture

pursuant to N.D.C.C. § 47-16-36, demanding that Murex release its lease interest.  In response, Murex

served and filed a Notice of Non-Termination of Oil and Gas Lease, refusing to release its interest.[5]

* * * *

[4] N.D.C.C. § 47-16-39.1 imposes its obligations on the "operator under an oil and gas lease." Given the nature of the obligations imposed by this section and the remedies provided, it appears that "operator" in this instance means both Burlington and Murex.

[5] Also, because an attorney for Murex advised plaintiffs that their acreage had been pooled with other acreage, plaintiffs served a Notice of Lease Forfeiture upon Burlington, as the well operator, on about September 17, 2010. Burlington responded on September 27, 2010, echoing Murex's response.

Murex states it is relying upon Burlington as the operator of the Lassen Well to make the required lease payments. In this case, it adopts Burlington's positions in terms of why the delays in the payment of royalty should be excused.

Burlington states that the delay in making royalty payments initially was because it did not receive its title opinion for the Lassen Well, which is dated June 15, 2010, until sometime after that date. Burlington states it took its outside law firm some four months to complete the 280-page opinion given its complexity. Then, after receipt of the opinion, Burlington states it identified two problems that needed to be resolved before paying any royalty to the plaintiffs. (Doc. Nos. 30-1 & 30-2).

More specifically, the title opinion notes that the Murex lease is subordinate to two outstanding mortgages. One is a 1999 Mortgage to Farm Credit Services ("FCS") and the other is a 1980 Mortgage to the Federal Land Bank of St. Paul that was later assigned to FCS.[6] The title examiner recommended that Burlington obtain a subordination of the FCS mortgages to the Murex lease, presumably to address the risk that the lessee could lose its interest if the mortgages were foreclosed. 4 E. Kuntz, A Treatise on the Law of Oil and Gas § 5.3 (Matthew Bender Rev. Ed.) ["Kuntz"] ("Where an oil and gas lease is granted after a mortgage has been granted on the land, a foreclosure will ordinarily destroy the rights of the lessee under the lease."). Also, the title examiner recommended that Burlington obtain clarification in writing in the form of a "division order" specifying who should be paid the royalty as between FCS and the plaintiffs with respect to the 1980 Mortgage and as between FCS and the plaintiffs and George E. Tank with respect to the 1999 Mortgage. This recommendation was made because of the language in the 1980 mortgage assigning the royalty payments to FCS and language

<hr/>

[6] There is no dispute that the 1999 Mortgage continues to secure outstanding debt and that it is superior to the Murex lease. The record is not clear, however, whether the 1980 Mortgage still secures debt or whether it is an old mortgage that has been satisfied but not released of record. For purposes of the remaining discussion, it will be assumed that the 1980 Mortgage is still outstanding, but, given the presence of the 1999 Mortgage, it does not make a material difference. Also, there may be a third 2010 mortgage that is subsequent to the Murex lease.

in the 1999 Mortgage requiring payments of royalties to be made to FCS at its option. (Doc. Nos. 30-1 & 30-2).[7]

Burlington claims that one of its landmen, William Hambright, wrote FCS in September 2010 requesting a subordination of its mortgages. And, when no response was forthcoming, another of its landmen, Paul Berlage, called Thomas Haustveit, plaintiffs' loan officer in FCS's Williston, North Dakota office, on November 11, 2010, to discuss the requested subordination. Burlington claims that Haustveit told Berlage that FCS would subordinate its mortgages so long as plaintiffs gave their consent. Burlington states that Berlage then contacted plaintiffs by telephone on November 16 and 17, 2010, to explain that Burlington required a subordination agreement from FCS and to ask plaintiffs for their consent. According to Berlage, plaintiffs were noncommital and asked what they stood to gain should they cooperate with Burlington's demands. Burlington also claims that it sent proposed

---

[7]  Burlington filed the following excerpts from its title opinion:

115.   By Mortgage dated December 9, 1980 and recorded on December 31, 1980 at Reception No. 228870, George E. Tank, Jr. and Phyllis B. Tank encumbered the NW/4 of Section 35 in favor of the Federal Land Bank of St. Paul. This Mortgage assigns all proceeds attributable to mineral development to the Mortgagee. The property has been conveyed to Gregory and Tommie Sue Tank, and this mortgage encumbers their 25% mineral interest and the surface of the NW/4 of Section 35. Their mineral interest is covered by Lease No. 51, which is inferior to this Mortgage.

> REQUIREMENT:   You must obtain a subordination agreement from The Federal Land Bank of St. Paul that subordinates this Mortgage to Lease No. 51. You must also obtain a division order from Gregory and Tommie Sue Tank and the Federal Land Bank of St. Paul that establishes the proper recipient of proceeds attributable to Lease No. 51.

116.   By North Dakota Mortgage dated May 26, 1999 and recorded on May 27, 1999 at Reception No. 334838, Gregory Tank, Tommie Sue Tank, and George E. Tank encumbered their interests in the NW/4 of Section 35 and all other lands in favor of Farm Credit Services of North Dakota, PCA. This Mortgage provides that the Mortgagee, at its option, may elect to receive all proceeds from mineral development. This mortgage was assigned to Farm Credit Services of North Dakota, PCA by document recorded at Reception No. 336510. The mineral interests owned by the Mortgagors is covered by Lease No. 51, which is inferior to this Mortgage.

> REQUIREMENT:   You must obtain a subordination agreement from Farm Credit Services of North Dakota, PCA that subordinates this Mortgage to Lease No. 51. You should also obtain a division order from Farm Credit Services of North Dakota and Gregory Tank, Tommie Sue Tank and George E. Tank establishing the proper reciepient of proceeds attributable to Lease No. 51.

(Doc. No. 30-1. Ex. B). Presumably, Lease No. 51 is the Murex lease.

subordinations to FCS along with a check in the amount of $150 for processing for the respective mortgages, but that FCS so far has refused to provide a subordination. Burlington blames plaintiffs' failure to give the consent requested by FCS for its inability to obtain a subordination. (Doc. Nos. 30-1 & 30-2).

More recently, FCS stated in an affidavit filed with the court that it did not believe that Burlington needed a subordination in order to make the necessary royalty payments. (Doc. No. 36-1). Also, plaintiffs have cited to a regulation that purportedly prohibits FCS from providing one. While the matter appears to have been in doubt previously, it appears now that a subordination from FCS will not be forthcoming.

As for the "proper payee" issue, Burlington states it received a letter from plaintiffs' attorney in January 2011 stating that FCS was willing to allow the royalty payments to be made directly to plaintiffs. Burlington states that it attempted to obtain written confirmation from FCS, but was unable to do so. (Doc. No. 30-2). Burlington states that it was not until plaintiffs filed a reply brief in connection with their present motions for preliminary relief that they tendered an affidavit from the Vice President of FCS of North Dakota. The affidavit states that it is agreeable with the checks being made payable to the plaintiffs and FCS, jointly, or only to plaintiffs. (Doc. No. 36-1).

Finally, Burlington states that plaintiffs have taken the position since last summer that the Murex lease has terminated because of the failure to make royalty payments. Burlington claims that plaintiffs' repudiation of the lease has created a hiatus in the obligation to pay royalties until the lease cancellation issue is resolved.

Plaintiffs, on the other hand, state that Burlington's claims of title defects are spurious, were asserted only after plaintiffs served their notices of lease forfeiture, and, in any event, are untimely.

Plaintiffs also dispute some of the comments attributed to them. In particular, they claim that any reluctance on their part to cooperate in the effort to obtain a subordination was because Burlington would not provide assurances that their consent would not prejudice their claim of lease cancellation. (Doc. Nos. 26-1 & 36-2).

Plaintiffs do acknowledge in their Amended Complaint that they advised an agent for Burlington on September 23, 2010, that they considered the lease terminated because of the nonpayment of royalties. (Doc. No. 18, ¶ 18). Also, in both October and November, 2010, Burlington attempted to tender royalty payments to plaintiffs. Plaintiffs refused the payments, again taking the position that the lease had been canceled.[8]

## B.    The claims for preliminary relief - Tract 1

Plaintiffs appear to be making two arguments for why the defendants should be required to pay royalties on the production attributable to Tract 1 pending final resolution of this case. The first is that the merits of the lease cancellation issue weigh so heavily in their favor that the court should order payment of the minimum royalty due for unleased acreage under the "forced pooling" statute.

The second argument is somewhat different in that it is not dependent upon weighing the merits of the lease cancellation issue. Plaintiffs' argument here is that some royalty is due regardless of the how the court rules on the lease cancellation issue. They argue it will either be the amount provided for in the "forced pooling" statute if the lease is cancelled, or the lease royalty if it is not. In addition, to alleviate any concern of overpayment, plaintiffs suggest that the court order payment of the minimum royalty under the "forced pooling" statute, since that would be the least amount payable, and award monetary relief later to make any necessary adjustments.

---

[8] Burlington now states that the tenders of payment were a mistake given the ongoing "curative work." (Doc. No. 30-2).

Defendants' position is that interim relief is not warranted because monetary relief is available to satisfy any harm that plaintiffs may suffer. In addition, they argue that the two issues identified in a title opinion received by Burlington from its outside counsel need to be resolved before any royalty can be paid. Finally, defendants also appear to take the position that the lease cancellation issue needs to be resolved first.

Since it does appear that some royalty will be due under either the lease or the "forced pooling" statute, the court will focus upon defendants' arguments for why no royalty needs be paid in the interim or at least not directly to plaintiffs. Following that, plaintiffs' lease-cancellation argument will be addressed briefly.

**C.      "Probability of success on the merits" - Tract 1 claim**

**1.      Defendants' demand for a subordination**

The right of the defendants to withhold payment of royalty based on plaintiffs' failure to provide a subordination must necessarily be premised upon (1) whether the Murex lease provides a warranty against existing liens, and (2) whether withholding the payment of royalty is an appropriate remedy. These questions will be considered separately.

**a.      Whether the Murex lease provides a warranty against existing liens**

**(i)      The lease language**

There are two sections of the Murex lease that are relevant to the determination of whether it provides a warranty against outstanding liens. One is the "conveyancing" clause, which reads in relevant part as follows:

> Witnesseth, That the Lessor, for and in consideration of . . . the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter contained, has **granted**, demised, leased and let, and by these presents does **grant**, demise, lease and let exclusively unto the said Lessee, the land hereinafter described,

with the exclusive right for the purpose of mining, exploring by geophysical and other methods, and operating for and producing therefrom oil and gas of whatsoever nature . . . .

(Doc. No. 18-1) (emphasis added).  The other is paragraph 14, which reads:

14.  Lessor hereby **warrants and agrees to defend title to the lands** herein described, and agrees that the Lessee shall have the right at any time to redeem for Lessor, by payment of any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof, and the undersigned Lessors, for themselves and their heirs, successors and assigns . . . .

(Doc. No. 18-1) (emphasis added).  While it may be that both provisions need to be considered together to ascertain the intent of the parties, the express warranty created in paragraph 14 by the words "warrants and agrees to defend title" will be considered first.

### (ii)     "Warrants and agrees to defend title"

Plaintiffs argue that the words "warrants and agrees to defend title" creates only a "covenant of warranty" and not a "covenant against encumbrances." The relevant distinction here being that the former is breached only by an actual or constructive eviction and not by the mere existence of outstanding liens.[9]  Plaintiffs further argue that, even if there is doubt about this point, the remaining "subrogation language" of paragraph 14 evinces an intent that the warranty does not extend to outstanding liens, but, even if it does, that the subrogation language provides the sole remedy in the event of any breach.

There is support for plaintiffs' arguments.  For example, in <u>Crum v. Guffey-Gillespie Oil Co.</u>, 230 P. 299 (Kan. 1924), the Kansas Supreme Court construed comparable oil and gas lease language

---

[9]  As a matter of common law and by statute in a number of jurisdictions, the ususal covenants of title are of seisen, quiet enjoyment, further assurance, warranty, and against encumbrances. <u>E.g.</u>, 20 Am. Jur. 2d <u>Covenants Etc.</u> § 54 (database updated May 2011); N.D.C.C. §§ 47-10-03 & 47-10-04.  While in many jurisdictions the mere presence of a lien is not enough to constitute a breach of the covenant of warranty, there are some jurisdictions that take a contrary view.  Also, there is some authority that an outstanding lien can be considered a "constructive eviction." <u>See</u> <u>generally</u> 20 Am. Jur. 2d <u>Covenants Etc.</u> § 76 (database updated May 2011).

to not include a covenant against encumbrances. After reciting the relevant lease language, the court stated:

> It will be noted that, while the lessor agreed to defend the title, he did not warrant the real estate to be free from incumbrances; the lessee was given the right to redeem from any and all such incumbrances, and was to have subrogation therefor. This provision in the lease contract precludes the idea that the land was warranted to be free from incumbrance; and certainly such a contract stipulation did not render the title unmerchantable, since the lessee acquired precisely what he bargained for.

Id. at 300. In addition, there are non-oil and gas cases in which courts have construed the words "warrant and defend title" as providing only a common law covenant of warranty and not a covenant against encumbrances. E.g., Leh v. Burke, 331 A.2d 755 (Penn. 1975) ("warrant and defend title" is a covenant of warranty that is not breached by the existence of outstanding liens or encumbrances, but applying a statutory warranty against encumbrances); Snider v. Van Petten, 180 Ill. App. 677, 1913 WL 2460 (App. Ct. Ill. 1913) (express covenant in a deed to "warrant and defend the title" is a covenant of warranty only and the existence of an outstanding lien was not a breach); see generally 20 Am. Jur. 2d Covenants, Etc. § 58 (database updated May 2011).

However, there is also substantial authority to the contrary. A number of courts have construed the words "warrant and defend title," or comparable language, as creating a general warranty (if it is against all claims) or a special warranty (if limited to claims arising by or through the grantor) that is broader than the common law covenant of warranty and that typically includes a warranty against encumbrances. E.g., Neil v. Phillips, No. CA 09-626, 2009 WL 4673835 (Ark. Ct. App. 2009) (deed stating that the grantor "will forever warrant and defend title to these lands against all claims whatsoever" included a warranty against encumbrances that was breached immediately upon delivery by the presence of a tax lien); Egli v. Troy, 602 N.W.2d 329 (Iowa 1999) (construing "warrant and defend the real estate" to be a special warranty that included a covenant against liens or encumbrances); Compton v. Trico Oil Co., 120 S.W.2d 534, 537 (Tex. Ct. Civ. App. 1938) (construing

covenant of general warranty to include that the property is free of encumbrances);  Clarke v. Iowa, 5 Clarke 62, 1857 WL 130 (Iowa 1857); see Oklahoma v. Harper, 180 P.2d 162 (Okla. 1947); see generally 21 C.J.S. Covenants § 23-24 (database updated May 2011); 6 Thompson on Real Property § 49.51 (Thomas Ed. 2010) ("Thompson on Real Property").  One treatise discussing the use of "warrants and agrees to defend title" in an oil and gas lease has summarized this line of cases as follows:

> In some jurisdictions, using words such as "demise" or "grant" will imply a warranty in a lease. [footnote omitted]  Most leases, however, have express clauses through which the lessor warrants title. A typical lease warranty would read: "Lessor hereby warrants and agrees to defend the title to such lands... ." Technically, this language would only create a covenant of warranty, a promise to defend title against future lawful claims and demands. To breach such a warranty would require ouster of the lessee. Nevertheless, some courts have treated the clause as a general warranty, which would include the covenants of seisin, right to convey, and no encumbrances.  [footnote omitted]  These covenants may be breached without ouster.

Thompson on Real Property at § 49.51.

The North Dakota Supreme Court has not addressed the scope of the "warrant and agrees to defend title" language in the context of an oil and gas lease.  In several recent deed cases, however, it has construed this language as creating a warranty that is apparently broader than the common law covenant of warranty and that would encompass a covenant against encumbrances.  E.g., State Bank & Trust of Kenmare v. Brekke, 1999 ND 212, 602 N.W.2d 681 (1999); ("State Bank & Trust"); Miller v. Koeckner, 600 N.W.2d 681 (N.D. 1999) ("Miller").  More particularly, the court held that the warranty created was a "special warranty" since it was limited by other language to claims by, through, or under the grantor.  In State Bank & Trust, the court stated the following:

> [¶ 11] The deed covenants "to warrant and defend" the title to the property against claims of persons "claiming by, through, or under" Duane and Jeanne Brekke. This is the language of a special warranty deed, as explained in 14 Powell on Real Property § 81A.03[1]:
> > A deed in which covenants are limited to defects which arise by, through, or under the actions of the grantor is known as a special warranty deed. Under

this limited form of warranty, recovery is available only if the defect arises because of the acts of the grantor.

Our court recognized this language of a special warranty deed in <u>Stracka v. Peterson</u>, 377 N.W.2d 580, 583 n. 6 (N.D.1985):

> A special warranty deed warrants title only against claims held by, through, or under the grantor, **or against encumbrances made or suffered by her**, and it cannot be held to warrant title generally against all persons. Therefore, under a special warranty deed a grantor is liable if the grantee's ownership is disturbed by some claim arising through an act of the grantor.

<u>State Bank & Trust</u>, 1999 ND 212, ¶ 11 (emphasis added).

The North Dakota Supreme Court has held in other contexts that an oil and gas lease conveys an interest in real property. <u>E.g.</u>, <u>Corbett v. La Bere</u>, 68 N.W.2d 211, 213-214 (1955); <u>Petroleum Exch. Inc., v. Poynter</u>, N.D., 64 N.W.2d 718 (1954). Consequently, it is very possible that the court could construe the words "warrant and defend title" in an oil and gas lease to create a warranty that is broader in scope than a covenant of warranty and that includes a warranty against existing encumbrances, similar to what it appears to have done in <u>State Bank & Trust</u> and <u>Miller</u> and similar to the construction that courts in a number of other jurisdictions have placed on this language. With respect to the argument that the express mention of liens later in paragraph 14 negates such an intent, the court could conclude that the subrogation clause simply provides additional rights in the event of a breach of outstanding liens or makes explicit what subrogation rights may already exist at common law for the discharge of an obligation of another.

On the other hand, the court might conclude that oil and gas leases should be treated differently. For example, the court might conclude that the use of the words "warrant and defend title" in oil and gas leases creates only a covenant of warranty and that liens and other encumbrances are typically addressed separately, either by the inclusion of an express covenant against encumbrances or in the subrogation clause. <u>Cf.</u> 4-6 P. Martin & B. Kramer, <u>Williams & Meyers, Oil and Gas Law</u> § 685 (Matthew Bender 2010) ("<u>Williams & Meyers</u>") (discussing the purposes of the warranty and

subrogation clauses but not necessarily reaching this conclusion); 4 <u>Kuntz</u> §§ 52.2 & 52.3. Also, the court could conclude that the intent of the parties based on the entire language of paragraph 14 was not to provide a warranty against existing liens and that the only rights of the lessor are the subrogation rights in the event of a default, similar to the conclusion reached by the Kansas Supreme Court.

### (iii)     The use of the word "grant"

Aside from the express warranty in paragraph 14, the "grant, demise, lease, and let" language of the conveyancing clause also needs to be considered.  This is because North Dakota is one of a number of states that have statutes which provide that the use of prescribed  "words of art" in a real estate conveyance will give rise to statutory covenants of title that typically include a covenant against encumbrances.  <u>See</u> <u>generally</u> 20 Am. Jur. 2d <u>Covenants, Etc.</u> § 40 (database updated May 2011). Courts in at least two states - Texas and Montana - have applied these statutes to oil and gas leases. <u>Barron v. Purnell Morrow Co.</u>, 2001 Tex. App. LEXIS 3835 (Tex. Ct. App. 2001) (unpublished per curiam);  <u>Fender v. Farr</u>, 262 S.W.2d 539, 543 (Tex. Ct. Civ. App. 1953) (use of the word "grant" or "convey" implies statutory covenants that include a against encumbrances); <u>McDaniel v. Hager-Stevenson Oil Co.</u>, 243 P. 582 (Mont. 1926) (assuming the correctness of applying a statutory covenant implied by the use of the word "grant" to an oil and gas lease that was otherwise silent in terms of any warranty).

In North Dakota, the relevant statute is N.D.C.C. § 47-10-19, which reads:

**47-10-19. Covenants implied from use of word grant**
From the use of the word "grant" in any conveyance by which an estate of inheritance or fee simple is to be passed, the following covenants, and none other, on the part of the grantor for the grantor and the grantor's heirs to the grantee and the grantee's heirs and assigns, are implied unless restrained by express terms contained in such conveyance:
> 1. That previous to the time of the execution of such conveyance, the grantor has not conveyed the same estate, nor any right, title, or interest therein, to any person other than the grantee; and

> 2. That such estate, at the time of the execution of such conveyance, is free from encumbrances done, made, or suffered by the grantor, or any person claiming under the grantor. Such covenants may be sued upon in the same manner as if they had been inserted expressly in the conveyance.

Similar to the Texas statute at issue in <u>Fender v. Farr</u>, N.D.C.C. § 47-10-19 applies only to conveyances of an estate of inheritance or fee simple, which raises the question of whether the interest acquired by a grantee under an oil and gas lease is such an estate under North Dakota law.

In <u>Fender v. Farr</u>, the Texas court concluded that the lessee's interest in that case was an estate of inheritance. 262 S.W.2d at 543. Texas is one of several jurisdictions where the courts have held that an oil and gas lease conveys an interest in the minerals in place and that a lease for an indeterminate term creates a fee simple determinable. <u>E.g.</u>, <u>In re Piazza's Estate</u>, 130 N.Y.S.2d 244, 246-247 (N.Y. Surrogate's Ct. 1954) (construing an oil and gas lease under Texas law and citing cases); <u>Dougherty v. Greene</u>, 67 So.2d 297, 300 (Miss. 1953); <u>Transcontinental Oil Co. v. Emmerson</u>, 131 N.E. 645 (Ill. 1921). At common law, an estate for an indefinite term, such as a fee simple determinable, is an estate of inheritance. <u>See</u> <u>generally</u> 31 C.J.S. <u>Estates</u> §§ 10 & 14 (1996).

Courts in a number of other jurisdictions have taken a different approach in defining the nature of the interest acquired by an oil and gas lessee, concluding that it is an incorporeal hereditament in the nature of a *profit a pendre*. <u>E.g.</u>, <u>Callahan v. Martin</u>, 43 P.2d 788 (Cal. 1935). The significance of this distinction is that while most courts hold that such an interest is real property and an "estate of inheritance" when it is for an indefinite term, there is authority to the contrary. <u>Compare</u>, <u>e.g.</u>, <u>Thacker v. Flottman</u>, 244 S.W.2d 1020, 1022-23 (Mo. 1952); <u>Fowler v. Marion & Pittsburg Coal Co.</u>, 146 N.E. 318 (Ill. 1925) (Ill. 1925); <u>Wyatt v. Larimer & Weld Irr. Co.</u>, 33 P. 144, 147 (Colo. 1893); <u>Nellis v. Munson</u>, 15 N.E. 739, 740-741 (N.Y. Ct. App. 1888); <u>with</u> <u>In re Aurora Oil & Gas Corp.</u>, 439 B.R. 674, 678-680 (Bkrtcy. W.D. Mich. 2010) (lessee's interest not an estate of inheritance under Michigan

law, citing <u>Redman v. Shaw</u>, 1 N.W.2d 555 (Mich. 1942), which held that an oil and gas lease for an indefinite term was not an estate in fee simple or estate of inheritance); <u>see</u> <u>generally</u> 31 C.J.S. <u>Estates</u>, § 10 (1996).[10]

In addition to holding that a lessee's interest in an oil and gas lease is a real property interest, the North Dakota Supreme Court has stated that a lease for a period of years, or for so long as oil and gas is produced, creates an interest that is of unlimited duration. <u>Corbett v. La Bere</u>, 68 N.W.2d at 213-214. The court is likely to conclude that a lessee's interest is an estate of inheritance when it is for an indefinite term, regardless of whether North Dakota is an "ownership in place" or an "incorporeal hereditament" state.[11] <u>See</u> <u>also</u> N.D.C.C. §§ 47-04-02 - 47-04-04; <u>cf.</u> <u>Beulah Coal Mining Co. v. Heihn</u>, 180 N.W. 787, 789 (1920).

---

[10] In <u>Thacker</u>, the Missouri Supreme Court explained:
> According to common law, estates are classified, with regard to duration or quantity of interest, as freehold estates and estates less than freehold. Estates less than freehold are regarded as chattel interests, and include leasehold estates or estates for years. <u>Orchard v. Wright-Dalton-Bell-Anchor Store Co.</u>, 225 Mo. 414, 125 S.W. 486; Vol. I, Tiffany, The Law of Real Property, § 25, pp. 33–35.
> We now again refer to the basic contention in the case at bar, and consider a mere right, as such, to go on the land of the Farrells and mine the clay therefrom. Although B may be conceded to be the owner of Whiteacre, A may own the right to enter thereon and mine clay or coal. We call this right of A an incorporeal hereditament—a mere intangible right issuing out of a corporeal thing—but we distinguish between the incorporeal right and that which it produces. 'A, as owner of the right to mine coal from Whiteacre, takes therefrom a carload of coal. The coal is personal property, but that has no bearing on the character of the right to take the coal. That right is an incorporeal hereditament and is capable of sustaining an estate of inheritance. It is a real property subject. But A's interest may be an estate of inheritance or an estate for years. *The only thing which determines whether A's estate in the incorporeal right is real or personal is the duration of or time limit on the estate.*' (Our italics.) Mills and Willingham, Law of Oil and Gas, § 5, p. 8.

244 S.W.2d 1022-23 (emphasis in original).

[11] The North Dakota Mineral Title Standards take no position on whether the lessee's interest is an ownership of the minerals in place or is an incorporeal hereditament under North Dakota law, stating there is no practical difference between the two. State Bar Ass'n of N.D., NDMTS § 8-01.1-03 (rev. 5/98). The treatises differ on their categorization of North Dakota law although all acknowledge some uncertainty. <u>Compare</u> E. Brown, E. Brown, Jr. & L. Gillaspia, <u>The Law of Oil and Gas Leases, 2nd Edition</u> ch. 3, § 3.02 (2d ed. Lexis Nexis Matthew Bender 2011) (categorizing North Dakota as an "ownership in place" state); 1-2 <u>Williams & Meyers</u>, § 203.3 (same); <u>with</u> 2 <u>Kuntz</u> § 23.21 (concluding the North Dakota Supreme Court would likely conclude the lessee's interest is an incorporeal hereditament).

But, even assuming that an oil and gas lessee's interest is an "estate of inheritance," the North Dakota Supreme Court could conclude that oil and gas leases should be treated differently for the reasons discussed earlier and not apply N.D.C.C. § 47-10-19. Also, an oil and gas lease is generally considered to be a hybrid between an ordinary lease of real property and the conveyance of a real property interest, particularly when it is for an indefinite term. North Dakota's statutory scheme governing the leasing of real property includes N.D.C.C. § 47-16-08, which implies only a covenant of quiet enjoyment in a lease of real property. The North Dakota Supreme Court could conclude that this statute should apply to oil and gas leases to the exclusion of N.D.C.C. § 47-10-19. Finally, the court might also conclude that the express language of paragraph 14 invokes the "exception" language of § 47-10-19, which provides that the implication of the statutory warranties can be restrained by express language in the conveyance to the contrary. Cf. Carkuff v. Balmer, 2011 ND 60, 795 N.W.2d 303 (use of the word "grant" in the deed was not controlling where it was clear from the rest of the language that it intended to only be a quitclaim).

The question of whether the Murex lease contains a warranty against encumbrances presents a difficult question of state law that could easily go either way. And here, since plaintiffs have failed to demonstrate irreparable harm for reasons discussed later, the resolution of this issue would not be the only thing standing in the way of granting plaintiffs interim relief. See 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.3 (2d ed. 1995) ["Federal Practice and Procedure"] (citing cases where courts have denied preliminary relief because of the difficulty of the legal issues but criticizing that approach). Thus, the court need not decide the issue now.[12]

---

[12] Any decision that the court might reach at this time would resolve the issue for purposes of interim relief but would not necessarily be final. See, e.g., Benson Hotel Crop. v. Woods, 168 F.2d 694, 697 (8th Cir. 1948).

That being said, the law generally is that the mere presence of a lien is a breach of a warranty against encumbrances. See generally 21 C.J.S. Covenants § 59 (database updated June 2011); 20 Am. Jur. 2d Covenants, Etc. § 89 (database updated May 2011). If the court rules that the Murex lease contains a warranty against encumbrances, the court is not likely to conclude that the subrogation language provides the only remedy.

### b.    Remedies available for the breach of the warranty

The remedy that most courts have concluded is appropriate for a breach of a covenant against encumbrances, at least when the encumbrance is a lien, is damages in the amount paid by the party suffering the breach to satisfy the lien or, in the absence of such a payment, nominal damages. See generally 21 C.J.S. Covenants §§ 59 & 86 (database updated June 2011). In North Dakota, the remedy is provided by statute. N.D.C.C. § 32-03-12 reads as follows:

> **§ 32-03-12. Damages for breach of covenant against encumbrances**
> The detriment caused by the breach of a covenant against encumbrances in a grant of an estate in real property is deemed to be the amount which has been expended actually by the covenantee in extinguishing either the principal or interest thereof, not exceeding in the former case a proportion of the price paid to the grantor, equivalent to the relative value at the time of the grant of the property affected by the breach as compared with the whole, or, in the latter case, interest on a like amount.

Also, while the court has not found any authority one way or the other, there may be an argument that if an oil and gas lessee can satisfy the lien and sue for damages, it should also be able to direct the royalty payments as they become due to the lienholder until the lien has been satisfied.

### c.    Conclusions regarding defendants' demand for a subordination

If the court concludes that the Murex lease does not contain a warranty against existing encumbrances, then obviously Murex is not entitled to a subordination. But, even if the court concludes that there is such a covenant, defendants have not cited any authority that supports the conclusion that they can continue to produce under the lease and withhold payments of royalties until

18

a subordination is provided.  Rather, it appears their remedy is limited to paying off the mortgages, suing for damages, and offsetting any royalty due against the amounts paid, or possibly being able to direct the royalty payments to FCS until the liens have been satisfied.

### 2.      Defendants' "proper payee" concern

If the only issue is who is entitled to the royalty as between plaintiffs and FCS, the clarification the defendants believe they need appears now to have been provided in the affidavit from the FCS official, albeit not until plaintiffs made their reply.

### 3.      Defendants' argument re plaintiffs' repudiation of the Murex lease

Defendants argue that plaintiffs' repudiation of the lease has created a hiatus in the obligation to pay lease royalty until the lease cancellation issue is resolved.  The problem with this argument in terms of the request for interim relief is that the defendants are continuing to produce oil and gas and there appears to be no question that some royalty is due, *i.e.*, it will either be the amount due under the "forced pooling" statute if the lease is cancelled or the lease amount if it is not.  Conceivably, the court could order that the royalty payments be deposited with the court, which would protect the defendants in terms of any concern of overpayment and also preserve their rights in terms of their ability later to either satisfy the FCS mortgages or pay down the mortgage liens if the court concludes they have that right.  Hence, plaintiffs' repudiation of the lease is not by itself enough to deny interim relief.

### 4.      Probability of success as to lease cancellation

As noted earlier, plaintiffs argue that the merits of the lease cancellation issue weigh so heavily in their favor that this alone justifies the court ordering that the defendants pay the minimum royalty due under the "forced pooling" statute.  In considering this issue, it appears the timeline of relevant events should be broken into two parts.  The first is from the commencement of production

in November 2009 until the completion of the title opinion in June 2010. The second is the period following the completion of the title opinion.

With respect to the first period, plaintiffs argue that the 150-day deadline provided for under N.D.C.C. § 47-16-39.1 ran before Burlington obtained its title opinion and this alone justifies cancellation of the lease. Assuming the 150-day deadline is one factor the court should consider in balancing the equities with respect to the issue of lease cancellation, it appears that most of the initial period of delay was consumed by the preparation of the lengthy title opinion and was not simply the result of neglect or willful delay.[13] Plaintiffs argue that the title work should have been completed earlier. But what seems more probable at this point is that the delay would have been comparable if Burlington had waited until the title work had been completed to begin drilling the well or later producing it.

With respect to the time period following the completion of the title opinion, defendants rely upon the issues raised by the title examiner and the curative work that was undertaken as one of the reasons to justify the nonpayment of the royalty.[14] In response, plaintiffs argue that Burlington did not begin any of the curative work until September 2009, which was after the plaintiffs had issued their Notice of Forfeiture. They argue the timing alone suggests that the curative work was undertaken only to provide an excuse for the delay in the payment of royalties that had already occurred and to avoid

---

[13] N.D.C.C. § 47-16-39.1 provides that 18% interest and attorney's fees can be assessed if the royalties that are due are not paid within 150 days from when the oil or gas is first marketed. The statute is less than clear, however, as to what role the 150-day deadline should apply when the issue is whether or not a lease should be cancelled. Most likely, the intent of the statute is that the court should consider the 150-day deadline as one factor in the balancing of the "equities" that must be considered, but that it is not dispositive.

[14] N.D.C.C. § 47-16-39.1 states that the section does not apply in the event of a "dispute of title that would affect the distribution of royalty payments." No ruling is made now as to whether the issues raised by the title examiner with respect to Tract 1are (1) a "dispute of title" within the meaning of § 47-16-39.1 or (2) "affect" the distribution of the royalty payments. However, given the statute's purpose, it would seem that this exception should be narrowly construed and is of questionable application to an easily resolvable issue, such as who is entitled the royalty payment between a lessor and a lienholder.

cancellation of the lease. However, another plausible conclusion is that the delay in the initiation of the curative work was the result of the time required to review the lengthy title, make decisions regarding the curative work required, and then to make arrangements for the work. At this point, the court is not persuaded that the couple of months delay necessarily means the curative work was undertaken in bad faith and simply to "paper over" the delay in payment of royalties.[15]

Plaintiffs also argue that defendants were not entitled to a subordination and that any issue of who was entitled to the payments could have quickly been resolved. These topics have already been addressed, but several additional points are relevant to the lease cancellation issue.

As noted earlier, even if the Murex lease contains a covenant against encumbrances, defendants likely cannot insist upon a subordination and withhold the payments of royalties until one is provided. Rather, the remedy for the breach is to pay off the mortgage liens or possibly being able to direct the royalty payments to the mortgagee until the liens have been satisfied. That does not mean, however, that the attempt to obtain a subordination was unreasonable or done in bad faith. A subordination would be a commonsense alternative to the exercise of the remedies provided by law, which, in this case, both parties may want to avoid. Consequently, some delay in the payment of royalties resulting from an attempt to obtain a subordination before a decision is made on whether to exercise the more drastic legal remedies does not seem unreasonable if the delay is not inappropriately long. And, even if the court concludes the lease does not contain a warranty against encumbrances, this also does not mean that the effort to obtain a subordination was unreasonable or done in bad faith given the uncertainty with respect to the law in this area and the recommendation of the title examiner.

---

[15] Plaintiffs proffer additional evidence in terms of Murex not raising the same issues with respect to the production from a different well for which Burlington was not the operator. Also, they point to the lack of mention of FCS in one of the proposed division orders. At this point, the court is unsure of the significance of this evidence, but any lack of coordination between Burlington and Murex may simply be inadvertence and more equitably remedied by requiring the payment of interest and attorney's fees rather than lease cancellation.

As for the "proper payee" issue, it does seem that this could have been quickly resolved, if it had been the only issue, simply by the issuance of checks made payable to the both plaintiffs and FCS.[16]  That being said, some delay resulting from an attempt to get an agreement from plaintiffs and FCS does not seem to be unconscionable and may have been reasonable if plaintiffs were insisting that the payments go only to them, which may have been the case for at least part of the period of time.

Finally, defendants point to plaintiffs' repudiation of the lease.  While that might not be an impediment to the court granting interim relief, plaintiffs' rejection of two lease payments during the period following the issuance of the title opinion suggests that plaintiffs would likely have rejected additional payments had they been made.  Plaintiffs argue that Burlington should have provided the written assurances they were seeking in terms of their receipt of the payments not prejudicing their right to argue lease cancellation, but their legal entitlement to such an assurance seems murky at best.

In summary, plaintiffs have not persuaded the court at this point that they are likely to succeed on the merits with respect to the lease cancellation issue, particularly given that it is a drastic remedy and other relief may be more appropriate under the circumstances.  Cf. Imperial Oil of N.D., Inc. v. Consol. Crude Oil Co., 851 F.2d 206 (8th Cir. 1988) (upholding district court's cancellation of lease under an earlier version of § 47-16-39.1 where the failure to pay was intentional and lacking in "any good faith explanation"); Canik v. Texas Int'l Petroleum Corp., 308 So.2d 453 (La. Ct. App. 1975) (delay in payment of royalty in part attributable to completion of title work);  Broadhead v. Pan Am. Petroleum Corp., 166 So.2d 329 (La. Ct. App. 1964) (delay of eight months in payment of royalty was

_____

[16]  Neither defendant has provided the court with a satisfactory explanation for why this sort of issue could not be resolved simply by the lessee advising the lessor of the purported right of the mortgagee under the mortgage to the royalty payments and stating that checks would be issued payable jointly to the lessor and the mortgagee unless the lessor provided written confirmation from the mortgagee that the payments could go to the lessor or the lessor agreed in writing that payments should go to the mortgagee.

22

not unreasonable where part of the delay involved efforts on the part of the defendants to undertake curative title work).

### D. The remaining __Dataphase__ factors - Tract 1 claim

With respect to the remaining __Dataphase__ factors, "public policy" favors the plaintiffs as evidenced by N.D.C.C. § 47-16-39.1. In addition, the relative balance of the hardships tips in their favor as well. This leaves the remaining factor of whether the plaintiffs have demonstrated "irreparable harm," which, if not proven, is reason alone to deny a request for preliminary relief. Cf. Gelco v. Coniston Partners, 811 F.2d 424, 420 (8th Cir. 1987).

Generally speaking, there is no "irreparable harm" within the meaning of Civ. P. 65(b) if the harm is compensable by money damages. E.g., In re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1142-47 (3rd Cir. 1982); see generally 11A Federal Practice and Procedure § 2948.1. It is for this reason that preliminary injunctions requiring the payment of money are almost never granted, except in the most extraordinary of situations. Id.[17]

This case, however, presents a closer question in that defendants are continuing to produce oil and gas and deplete plaintiffs' mineral resource. While the continuing harm is also compensable by money damages, as well as statutory interest at the rate of 18% and attorney's fees, that is only true if the defendants are later able to make payment.

If there was any evidence in this case credibly indicating that the defendants may lack the ability to pay the royalty on the oil and gas that is being produced, the court might very well have required the defendants to deposit the royalty with the court. Cf. Foodcomm Int'l. v. Barry, 328 F.3d

---

[17] Plaintiffs have not asked for a temporary injunction suspending production until the questions surrounding the payment of the statutory royalty can be resolved nor does one appear to be appropriate given the interests of others in the pooled acreage and the statutory regime that allows for the production.

300 (7th Cir. 2003); <u>Micro Signal Research, Inc. v. Otus</u>, 417 F.3d 28 (1st Cir. 2005); <u>Cattle Finance Co. v. Boedery, Inc.</u>, 795 F. Supp. 362 (D. Kan. 1992). But, in the absence of such evidence, the court believes the more appropriate thing to do is to deny the request for preliminary relief, but, at the request of plaintiffs, expedite the trial of this matter. <u>See</u> 11A <u>Federal Practice and Procedure</u> § 2948.1.

## IV.    THE REQUEST FOR PRELIMINARY RELIEF - TRACT 2

### A.    Additional background Tract 2

The following facts appear to be undisputed as to Tract 2:

- Plaintiff Greggory Tank's interest in Tract 2 is unleased. (Doc. Nos. 18 & 40-1).

- Tract 2 is part of a spacing unit that is subject to a pooling order issued by the North Dakota Industrial Commission with respect to the Kings Canyon Well. (Doc. Nos. 18 & 40-1).

- Oil or gas has been produced and marketed from the Kings Canyon Well since December 22, 2009. (Doc. Nos. 20, 40-1, 46-1).

- The "Division Order Title Opinion" that Burlington received for the Kings Canyon Well is dated April 19, 2010. (Doc. No. 42-1).

- Following the commencement of production, there were additional proceedings before the North Dakota Industrial Commission to determine whether or not a "risk penalty" should be imposed on plaintiffs' working interest. On September 29, 2010, the Industrial Commission denied Burlington's request to impose a risk penalty. The Commission concluded that Burlington had not fully complied with the requirements of N.D.C.C. § 38-08-08 in terms of the steps required to first attempt to obtain a lease from the plaintiffs. However, the Commission stated it could make another request

for a risk penalty later, after having made the requisite attempt to negotiate a lease. (Doc. No. 46-2).

- Burlington sent a letter to plaintiffs dated November 22, 2010, formally advising of them of their right to participate in the well or offering them the alternative of a lease option. (Doc. No. 40-1).

- Following the receipt of Burlington's November 22 letter, plaintiffs elected to participate in the costs of the well. Their written election to participate was received by Burlington on December 21, 2010. (Doc. Nos. 40-2 & 4--3).

- No royalty has yet been paid with respect to Tract 2.[18]

**B.     "Probability of success on the merits" - Tract 2**

When plaintiffs first filed their motion, Burlington's initial response ignored Tract 2. It was only after the court inquired about Tract 2 during a telephone conference that Burlington filed a supplemental response which included excerpts from a title opinion for the Kings Canyon Well that Burlington now claims raises issues that need to be resolved before royalty can be paid. (Doc. No. 42-1).

Burlington points to a recommendation in the title opinion that it obtain a subordination. But here, the title examiner is obviously referring to the interests of owners that are leased and not Tank's unleased interest. Moreover, Burlington has failed to explain why it would be entitled to a subordination of FCS's mortgages to Tank's unleased interest in any event and none is apparent.

Burlington also claims that the title examiner recommended that Burlington obtain a division

---

[18] Burlington forwarded a proposed division order to the plaintiff using the name "Greggory G. Tank" on or about March 29, 2011. (Doc. No. 40-7). It is not clear what the purpose for this was. Also, because of the court's unfamiliarity with the numbers, it is not clear whether this relates to the royalty interest or working interest, or both.

order specifying who is to receive the royalty payments between Tank and FCS. However, based on the excerpts of the title opinion that are before the court, there is some doubt about whether this recommendation was actually made with respect to Tank's Tract 2 interest.[19] But whether it was or not seems beside the point now. The purported recommendation was made back in April of 2010, and, as noted earlier, this is an issue that could have been quickly resolved. Moreover, Burlington has not submitted any evidence that it advised Tank that this was an issue, and asked him to rectify it, or that Burlington undertook its own curative effort. In summary, the proper payee issue appears to be nothing more than an after-the-fact excuse for the failure to make the royalty payments that are due.[20]

Following Burlington's initial supplemental response, it filed yet another response stating that no payment of royalty is due given Tank's election to participate in the well. Burlington argues that Tank's share of the development costs currently exceeds the amount of royalty due dating back to December of 2009 and it is entitled to an offset. This argument, however, also appears to be without merit given the North Dakota Supreme Court's decision in Slawson v. North Dakota Industrial Comm'n, 339 N.W.2d 772 (N.D. 1983). In Slawson, the court rejected the notion that an operator could retain the royalty due on an unleased interest under N.D.C.C. § 38-08-08 until the operator recovered its development costs, pointing to the language of the statute stating that the royalty is "cost free" and that the lien for the development costs extends only to the amounts payable on the working interest.

---

[19] Plaintiffs acknowledge that Tank's Tract 2 mineral interest is covered by the 1999 Mortgage, but state that its inclusion was a mistake that FCS is prepared to rectify.

[20] One recommendation that the title examiner did clearly make with respect to Tank's interest in Tract 2 is that Burlington obtain a curative affidavit to explain the discrepancies in the spelling of Greggory Tank's name. For good reason, Burlington has not attempted to argue that this somehow justified withholding the payment of royalty.

In summary, Burlington has failed to offer any good reason why royalties are not now being paid to Tank with respect to Tract 2. In fact, there is little in the record so far that would provide an excuse for why payment was not made within the 150-day deadline set forth in N.D.C.C. § 47-16-39.1.

**C.** **The remaining <u>Dataphase</u> factors - Tract 2**

As with Tract 1, the public interest and balance-of-the-hardship factors favor Tank. But, even with that assumption, this does not appear to be the extraordinary situation that would justify preliminary injunctive relief that orders the payment of money for the reasons already discussed. Nevertheless, if plaintiffs request, the court will expedite consideration of the Tract 2 claim on summary judgment and order an expedited trial if it turns out there are material facts in dispute.

**V.** **<u>ORDER</u>**

For the reasons set forth above, plaintiffs' Motion for Injunction and Motion for Declaratory Judgment (Doc. Nos. 25 and 27) are **DENIED** without prejudice. However, the court will schedule a telephone conference with the parties to discuss expediting the resolution of the Tract 1 and 2 claims, including the use of abbreviated summary judgment procedures with respect to the Tract 2 claim.

**IT IS SO ORDERED.**

Dated this 28th day of June, 2011.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge