**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

Greggory G. and Tommie S. Tank,    )
                                         )    **MEMORANDUM OPINION AND**
                 Plaintiffs,      )    **ORDER GRANTING IN PART AND**
                                           )    **DENYING IN PART CROSS MOTIONS**
        vs.                   )    **FOR PARTIAL SUMMARY JUDGMENT**
                                           )
Burlington Resources Oil and Gas    )
Company, LP, and Murex Petroleum    )
Corporation,                          )
                                           )    Case No. 4:10-cv-088
                  Defendants.      )

_____

## I.    BACKGROUND AND UNCONTESTED FACTS

Except as otherwise noted, the facts set forth below do not appear to be contested.

### A.    The parties and the two wells

Plaintiffs Greggory G. Tank and Tommie S. Tank (collectively the "Tanks") own mineral interests in the NW¼ of Section 35, Township 151 North, Range 96 West, in McKenzie County, North Dakota. The Tanks have leased this interest to Murex Petroleum Corporation ("Murex") (the "Murex Lease"). The North Dakota Industrial Commission ("Industrial Commission") pooled the Tanks' mineral acres and Murex's lease interest together with other acreage from Sections 26 and 35 controlled by third parties for purposes of drilling the Lassen Well #41-26H ("Lassen Well") in Section 26 by defendant Burlington Resources Oil and Gas Company, LP ("Burlington"), the well operator.[1]

---

[1] Burlington is a subsidiary of ConocoPhillips. Some of the persons performing work for Burlington may have been ConocoPhillips employees and, to that extent, both entities will be collectively referred to herein as "Burlington."

Plaintiff Greggory Tank also owns a mineral interest in 16.667 acres of land located in the N½SE ¼ & E½SW¼ of Section 34, which is unleased. The Industrial Commission pooled Tank's unleased interest with other acreage in a separate unit for the drilling of the Kings Canyon Well #21-27H ("Kings Canyon Well") for which Burlington is also the operator. Murex does not have an interest in the Kings Canyon Well.

### B.    This action

The Tanks commenced this action in state court in November 2010, and it was removed to this court in December 2010. In their amended complaint, the Tanks allege that defendants failed to make timely payment of royalty on production from the Lassen Well and that Burlington separately failed to make timely payments of royalty for the Kings Canyon Well.

With respect to the Lassen Well, the Tanks seek an order from the court cancelling the Murex Lease pursuant to N.D.C.C. § 47-16-39.1, which authorizes cancellation of an oil and gas lease for failure to make timely payments of royalty when the equities support cancellation. In the alternative, the Tanks seek interest on the unpaid royalty at the rate of 18% as provided for by § 47-16-39.1 when an operator fails to pay the royalty that is due within 150 days of when oil or gas produced is first marketed. They also request attorney's fees and costs, which § 47-16-39.1 allows to the prevailing party.

With respect to the Kings Canyon Well, Greggory Tank seeks payment of 18% interest pursuant to § 47-16-39.1 on the cost-free royalty on unleased interests authorized by N.D.C.C. § 38-08-08 as well as attorney's fees and costs. Since Tank's interest was unleased, there is no issue of lease cancellation with respect to the Kings Canyon Well.

In addition to the Tanks' claims, Murex filed a cross-claim against Burlington claiming Burlington should be held liable for damages Murex suffers if the Murex Lease is cancelled as well

as for any other liability that may be imposed upon Murex.  Also, Murex filed a counterclaim against the Tanks for a breach of covenant against encumbrances under the Murex Lease, but later sought to have it dismissed after Murex discovered in its files a subordination agreement that it had obtained from the mortgagee in question some years earlier in connection with a well it had drilled back in 2003.  The Tanks, however, claim the dismissed counterclaim was brought in bad faith and seek attorney's fees and costs.

Before the court now are cross-motions for partial summary judgment that have been filed by the parties.

C.     **The Lassen Well**

1.     **The drilling of the well prior to the completion of any title work**

The Tanks leased their mineral interests in the NW¼ of Section 35, Township 151 North, Range 96 West, to Murex on March 24, 2003.  Pursuant to the lease, Murex obtained the "working interest" to the oil and gas underlying this acreage and the Tanks retained a 3/16 (18.75%) royalty interest.

Burlington began drilling ("spud") the  Lassen Well on September 2, 2009, and completed the drilling effort on October 31, 2009.  Burlington did not obtain a title opinion prior to commencement of drilling to confirm the ownership interests in the tracts that the Industrial Commission had pooled together for purposes of the Lassen Well.  Burlington's land personnel explained during their deposition testimony that it is common practice for operators to defer the preparation of an initial "drilling" opinion and combine it with a final "division order" opinion for

wells being drilled in the Bakken formation in North Dakota because of the high probability of their success in obtaining production.[2]

## 2. The title opinion and issues raised by the title attorney

On September 22, 2009, about two weeks after the Lassen Well was spud, Access Resources, Inc. (a land firm working for Burlington) sent to Burlington's outside law firm an abstract for the lands encompassed within the Industrial Commission's pooling order. The Industrial Commission's order pooled together two complete sections of land for the Lassen Well, *i.e.*, all of Section 35 (containing in part the Tanks' interest and the Murex Lease in the NW¼) and all of the adjoining Section 26, for a total of approximately 1280 acres.

For reasons not completely explained by the record, Burlington's outside title attorney did not begin work on the combined drilling and division order opinion until early February 2010. She testified in her deposition that the opinion, which encompassed the interests in the two sections of land, was the longest and most complex opinion she had ever prepared. The evidence indicates she worked on the opinion, more or less continuously, until it was completed on June 15, 2010, that she expended 473.50 hours in its preparation, that the opinion was 280 pages in length, and that it cost Burlington $89,965.00.

Notably, the completion of the title opinion came after the expiration of 150-day deadline under N.D.C.C. § 47-16-39.1 for payment of royalty before the 18% statutory interest penalty began

---

[2] Frequently, an operator will obtain a drilling opinion prior to commencement of drilling to make sure it has acquired the necessary interests or agreements to drill the well. If the well is successful, the operator will then typically order a second division order opinion that is used to determine how the production from the well must be divided among those entitled to take. For this reason, the division order opinion is more comprehensive and also needs to be current as of the commencement of production. See generally Si M. Bondurant, To Have and to Hold: The Use and Abuse of Oil and Gas Suspense Accounts, 31 Okla. City Univ. L. Rev. 1, pp. 4-5 (Spring 2006) (discussing the differences between drilling opinions and division order opinions).

4

to accrue. While the precise date for when the 150-day time period ran cannot be determined from what is before the court here, the parties agree that the first production of marketable oil or gas took place in November 2009, which would mean that the 150-day deadline likely ran sometime in April 2010.

The title opinion raised two issues with respect to the Tanks' interests and the Murex Lease, both having to do with two outstanding mortgages on the Tanks' property. One was a 1999 mortgage to Farm Credit Services ("FCS") and the other was a 1980 mortgage to the Federal Land Bank of St. Paul that was later assigned to FCS.

The first issue raised by the title attorney was the fact that both mortgages were superior to the Murex Lease. To address this issue, the title attorney recommended that Burlington obtain a subordination of the FCS mortgages to the Murex Lease. The second issue had to do with language in the mortgages relating to the payment of royalty. The title attorney concluded that the language of the 1980 mortgage assigned the royalty to FCS and that the language of the 1999 mortgage gave FCS the option to elect to receive the royalty payments. The title attorney recommended that Burlington obtain clarification in writing in the form of division orders specifying who should be paid the royalty as between FCS and the Tanks.[3]

_____

[3] The title attorney stated the following with respect to the two issues:
115.   By Mortgage dated December 19, 1980 and recorded on December 31, 1980 at Reception No. 228870, George E. Tank, Jr. and Phyllis B. Tank encumbered the NW/4 of Section 35 in favor of The Federal Land Bank of St. Paul. This Mortgage assigns all proceeds attributable to mineral development to the Mortgagee. The property has been conveyed to Gregory and Tommie Sue Tank, and this mortgage encumbers their 25% mineral interest and the surface of the NW/4 of Section 35. Their mineral interest is covered by Lease No. 51, which is inferior to this Mortgage.
   REQUIREMENT:   You must obtain a subordination agreement from The Federal Land Bank of St. Paul that subordinates this Mortgage to Lease No. 51. You must also obtain a division order from Gregory and Tommie Sue Tank and The Federal Land Bank of St. Paul that establishes the proper recipient of proceeds attributable to Lease No. 51.

(continued...)

5

### 3. Commencement of the curative work recommended by the title attorney

In late July 2010, Brian Dart, an in-house Burlington landman, uploaded the title opinion to a shared computer drive so it could be accessed from an external site and asked Burlington's land contractor, Access Resources, to begin the curative work on the issues raised by the title attorney. Because of the title attorney's comments with respect to the Tanks' interest and the recommendations for curative work, Burlington put the Tanks' royalty interest in suspense.

Access did not begin the curative work with respect to the Tanks' interests until September 27, 2010, when a landman working for Access wrote FCS requesting that it subordinate its mortgages to the Murex Lease. Part of the reason for the delay appears to have been the volume of curative work required by the title attorney as well as simple logistics. Dart testified in his deposition that the title opinion was the biggest one he had ever received and that it contained 125 recommendations for curative work as opposed to a more typical opinion that might have up to 60 recommendations.

### 4. The Tanks' complaints about the delay in payment of royalty and their repudiation of the Murex Lease

While all of this was going on, the Tanks claim (and the court assumes to be true for purposes of this opinion) that they began contacting Burlington as early as June 2010 about the

---

[3](...continued)
116.   By North Dakota Mortgage dated May 26, 1999 and recorded on May 27, 1999 at Reception No. 334838, Gregory Tank, Tommie Sue Tank, and George E. Tank encumbered their interests in the NW/4 of Section 35 and other lands in favor of Farm Credit Services of North Dakota, PCA. This Mortgage provides that the Mortgagee, at its option, may elect to receive all proceeds from mineral development. This Mortgage was assigned to Farm Credit Services of North Dakota, PCA by document recorded at Reception No. 336510. The mineral interest owned by the Mortgagors is covered by Lease No. 51, which is inferior to this Mortgage.

REQUIREMENT:   You must obtain a subordination agreement from Farm Credit Services of North Dakota, PCA that subordinates this Mortgage to Lease No. 51. You should also obtain a division order from Farm Credit Services of North Dakota and Gregory Tank, Tommie Sue Tank and George E. Tank establishing the proper recipient of proceeds attributable to Lease No. 51.

(Doc. No. 30-1, Ex. B).

status of their royalty, but did not receive what they considered to be a satisfactory response. When payment was not forthcoming by the beginning of August, the Tanks served Murex with a Notice of Lease Forfeiture pursuant to N.D.C.C. § 47-16-36 dated August 4, 2010, demanding that Murex release its lease interest. In response, Murex served and filed a Notice of Non-Termination of Oil and Gas Lease dated August 11, 2010, refusing to release its interest. Murex also advised the Tanks that Burlington was the well operator and, as such, was the entity responsible for making the royalty payments. Consequently, the Tanks served a similar Notice of Lease Forfeiture dated September 17, 2010, upon Burlington, and Burlington responded by serving and filing a Notice of Non-Termination of Oil and Gas Lease dated September 27, 2010.

In addition to taking these actions, the Tanks also had a conversation with Dart on September 23, 2010, during which they told him they considered the Murex Lease to have terminated for non-payment of the royalty.[4] As explained later, the court considers this to be a watershed date in terms of the lease cancellation claim.

> ### 5. Burlington's "mistaken" tenders of royalty, continued curative work, and other actions taken by the parties following the Tanks' declaration that the Murex Lease was no longer in effect

Because of the Tanks' claim of lease cancellation grounded upon a failure to timely pay royalty, Dart requested that the Tanks' royalty interest be taken out of suspense and put on "pay status." Consequently, a royalty check was sent to the Tanks in October 2010. The Tanks, however, refused to accept payment - consistent with their position that the Murex Lease had terminated.

---

[4]   In particular, the Tanks stated in their amended complaint:
       18.    On September 23, 2010, an agent of Burlington Resources named Brian Dart contacted Plaintiffs' attorney, and Mr. Dart was informed that the lease [*i.e.*, the Murex Lease] was considered cancelled for nonpayment of royalties.
(Doc. No. 18, p. 3). Consistent with such a conversation having occurred, Dart sent out an e-mail the same day stating "Greg Tank is claiming his lease has forfeited due to non-payment." (Doc. No. 115-1, p.5).

Dart claimed in his deposition testimony that the October tender of payment was a mistake. He testified he took this action without first checking on what the title attorney had recommended and that he reversed course and requested that accounting put the Tanks' interest back in suspense when he realized there were unresolved issues regarding the Tanks' interest. However, in the confusion, a second royalty check was sent to the Tanks in November 2010, which they similarly refused.

When FCS did not respond to the September 23, 2010, written request that it subordinate its mortgages to the Murex Lease, a second Access Resources landman called the Tanks' loan officer in FCS's Williston, North Dakota office, on November 11, 2010, to discuss the requested subordination and was told that FCS would subordinate its mortgages only if the Tanks gave their consent. The same landman then contacted the Tanks by telephone on November 16 and 17, 2010, requesting their consent, explaining that Burlington required a subordination agreement and that FCS would only give one if the Tanks consented. According to the landman, the Tanks were noncommittal and asked what they stood to gain should they cooperate with Burlington's demands. While the Tanks do not dispute that they refused to give their consent, they do dispute the comments attributed to them and claim their reluctance to provide a subordination was because Burlington would not provide assurances that their consent would not prejudice their claim of lease cancellation. For purposes of the court's decision here, any dispute about what was said at this point is not material.

### 6. Commencement of this action, the court's order denying preliminary relief, and Burlington's payment of royalty

While it is not clear from the record here when Burlington and Murex were served with the state-court complaint, which is dated November 2, 2010, the case was removed to this court by the defendants on December 3, 2010. Following the commencement of this action, there was some interaction between Burlington and the Tanks' counsel to try to resolve the outstanding title comments,

which were not successful as of the point that the Tanks filed a motion for preliminary injunction and declaratory relief. Also unresolved was the Tanks' demand that Burlington agree that any acceptance of payment of royalty by them would not constitute a waiver of their claim for lease cancellation.

In late June 2011, the court denied the Tanks' motion for preliminary relief. In its memorandum opinion, the court addressed the first comment of the title attorney regarding the superiority of the Tank mortgages and (1) expressed doubts about whether FCS was ever going to provide the requested subordinations based on an affidavit from the FCS loan officer filed in connection with the pending motion, and (2) observed that, even if the Murex Lease contained a covenant against encumbrances (which was and still is disputed by the Tanks), defendants' remedies would be limited to either paying off the mortgages or possibly making direct payments of royalty to FCS to reduce the outstanding mortgage balances - particularly since Murex had not attempted to rescind the lease based upon the claimed breach of a covenant against encumbrances. Tank v. Burlington Resources Oil and Gas, Co., L.P., No. 4:10-cv-088, 2011 U.S. Dist. Lexis 70238, 2011 WL 2600458, at *10 (D.N.D. June 28, 2011) ("Tank"). With respect to the second title comment, the court made clear that it thought that any issue regarding who was entitled to the royalty as between the Tanks and FCS could readily be resolved by Burlington simply issuing checks made payable to both parties. Id. at *11.

At some point following the issuance of the court's memorandum opinion, Burlington paid the Tanks the amount of royalty it calculated was due together with penalty interest at the rate of 18% as provided for by § 47-16-39.1, which Burlington calculated from and after the 150th day from the first marketing of oil and gas. Burlington takes the position this was done as matter of voluntary accommodation and not because it conceded that the issues raised by its title attorney were insufficient

to invoke the exception under § 47-16-39.1 that provides safe harbor from the statute's penalty provisions when there exists a dispute of title affecting the distribution of royalty payments.

### 7. Murex's discovery of an earlier subordination by FCS

Finally, at some point late in the discovery in this case, Murex conducted a search of its file for a well that it had drilled on the Tanks acreage in 2003 and found a subordination signed by FCS subordinating its mortgages to the Murex Lease. Defendants concede this subordination was sufficient to satisfy the issue raised by Burlington's title attorney regarding the superiority of FCS's mortgages. It appears the reason why Burlington's title attorney was unaware of the subordination was because it had not been recorded in the public land files and, for that reason, was not included in the land records she examined.

### D. The Kings Canyon Well

Oil or gas was first produced and marketed from the Kings Canyon Well on December 22, 2009. The division order title opinion that Burlington obtained for the Kings Canyon Well was completed on or about April 19, 2010. The 150-day deadline for paying royalty under § 47-16-39.1 before having to pay 18% penalty interest expired on or about May 21, 2010.

Following the commencement of production, there were additional proceedings before the Industrial Commission, including whether a "risk penalty" should be imposed on the Tank's working interest (*i.e.*, his unleased mineral interest less the statutorily created cost-free royalty) as provided for by N.D.C.C. § 38-08-08. On September 29, 2010, the Industrial Commission denied Burlington's request to impose a risk penalty. The Commission concluded that Burlington had not fully complied with the requirements of § 38-08-08 in terms of the steps required to first attempt to obtain a lease from Tank. However, the Commission stated Burlington could make another request for a risk penalty after Burlington had made the requisite attempt to negotiate a lease.

Burlington then sent a letter to Tank dated November 22, 2010, formally advising him of his right to participate in the well and offering, as an alternative, a lease option. Following the receipt of Burlington's November 22 letter, Tank elected to participate in the costs of the well, and his written election to participate was received by Burlington on December 21, 2010.

During all of this time, Burlington failed to pay to the Tanks their cost-free royalty as provided for by § 38-08-08. The Tanks' claim for relief with respect to the Kings Canyon Well was added to this action in an amended complaint that was filed on December 23, 2010. Later, after this court issued its order denying the Tanks preliminary relief (and likely in response to the court's questioning Burlington's reasons for lack of payment), Burlington paid the royalty amounts it calculated were due and may have also paid the 18% penalty interest, although the record is not clear about that.

## II.  GOVERNING LAW

### A.  North Dakota law governing statutory construction

Because this case raises a number of difficult issues with respect to N.D.C.C. § 47-16-39.1's construction and application, it is necessary to consider North Dakota's law governing the construction of its statues. Roubideaux v. North Dakota Dept. of Corrections and Rehabilitation, 570 F.3d 966, 972 (8th Cir. 2009) (a federal court looks to state law for the law governing the construction of state statutes). Recently, the North Dakota Supreme Court summarized the state's law as follows:

> Our primary objective in interpreting a statute is to determine the legislature's intent, and we initially look to the language of the statute to determine intent. [Schmidt v. Gateway Cmty. Fellowship, 2010 ND 69, ¶ 14, 781 N.W.2d 200]. Words in a statute are given their plain, ordinary, and commonly understood meaning, unless they are defined by statute or unless a contrary intention plainly appears. N.D.C.C. § 1-02-02. Statutes are construed as a whole and are harmonized to give meaning to related provisions. N.D.C.C. § 1-02-07. The letter of a statute cannot be disregarded under the pretext of pursuing its spirit when the language of the statute is clear and unambiguous. N.D.C.C. § 1-02-05. "[I]f the language of a statute is ambiguous or of

doubtful meaning or if adherence to the strict letter of the statute would lead to an absurd or ludicrous result, the court may resort to extrinsic aids to interpret the statute." Stutsman County v. State Historical Soc'y, 371 N.W.2d 321, 325 (N.D.1985). "'A statute is ambiguous if it is susceptible to different, rational meanings.'" Sauby v. City of Fargo, 2008 ND 60, ¶ 8, 747 N.W.2d 65 (quoting Simon v. Simon, 2006 ND 29, ¶ 12, 709 N.W.2d 4). Section 1-02-39, N.D.C.C., lists extrinsic aids for construing ambiguous statutes:

> If a statute is ambiguous, the court, in determining the intention of the legislation, may consider among other matters:
>   1. The object sought to be attained.
>   2. The circumstances under which the statute was enacted.
>   3. The legislative history.
>   4. The common law or former statutory provisions, including laws upon the same or similar subjects.
>   5. The consequences of a particular construction.
>   6. The administrative construction of the statute.
>   7. The preamble.

Locken v. Locken, 2011 ND 90, ¶ 9, 797 N.W.2d 301.

### B.     N.D.C.C. § 47-16-39.1 (2009)

The version of N.D.C.C. § 47-16-39.1 that applies in this case is the one that was amended and

reenacted in 2009. The full text of the statute is set forth below with portions repeated later as

particular issues are discussed:

> **§ 47-16-39.1. Obligation to pay royalties--Breach.** The obligation arising under an oil and gas lease to pay oil or gas royalties to the mineral owner or the mineral owner's assignee, or to deliver oil or gas to a purchaser to the credit of the mineral owner or the mineral owner's assignee, or to pay the market value thereof is of the essence in the lease contract, and breach of the obligation may constitute grounds for the cancellation of the lease in cases where it is determined by the court that the equities of the case require cancellation. If the operator under an oil and gas lease fails to pay oil or gas royalties to the mineral owner or the mineral owner's assignee within one hundred fifty days after oil or gas produced under the lease is marketed and cancellation of the lease is not sought or if the operator fails to pay oil or gas royalties to an unleased mineral interest owner within one hundred fifty days from initial oil or gas production from the unleased mineral interest owner's mineral interest, the operator shall pay interest on the unpaid royalties at the rate of eighteen percent per annum until paid, except that the commissioner of university and school lands may negotiate a rate to be no less than the prime rate as established by the Bank of North Dakota plus four percent per annum with a maximum of eighteen percent per annum, for unpaid royalties on minerals owned or managed by the board of university and school lands. Provided, that the operator may remit semiannually to a person

entitled to royalties the aggregate of six months' monthly royalties where the aggregate amount is less than fifty dollars. The district court for the county in which the oil or gas well is located has jurisdiction over all proceedings brought pursuant to this section. The prevailing party in any proceeding brought pursuant to this section is entitled to recover any court costs and reasonable attorney's fees. This section does not apply when mineral owners or their assignees elect to take their proportionate share of production in kind, in the event of a dispute of title existing that would affect distribution of royalty payments, or when a mineral owner cannot be located after reasonable inquiry by the operator; however, the operator shall make royalty payments to those mineral owners whose title and ownership interest is not in dispute.

N.D.C.C. § 47-16-39.1 (2009); 2009 <u>N.D. Sess. Laws</u>, ch. 314, § 2.

## C. <u>History of N.D.C.C. § 47-16-39.1</u>

### 1. Initial enactment in 1961

N.D.C.C. § 47-16-39.1 first became law in 1961. At that time, it contained only: (1) a recitation that the obligation to deliver for the credit of the mineral owner the mineral owner's share of production is the essence of a lease contract; (2) a provision authorizing a court to cancel a lease for untimely payment of royalty when the equities require; and (3) an exception stating that the section would not apply if the mineral owner elected to take his or her share of production in kind or "in the event of a dispute of title existing which would effect distribution of royalty payments." 1961 <u>N.D. Sess. Laws</u>, ch. 295, § 1.

The legislative history for the 1961 law suggests it was enacted because mineral owners were complaining about what they perceived to be unreasonable delays in the payments of royalty and that their only apparent remedy was to sue to recover the amount of royalty due. A legislative report stated that the provision for lease cancellation would make the failure to promptly pay royalties a more serious matter, but would not unduly penalize lease operators if they had reasonable grounds for failing

to make prompt payment given the statutory exceptions. <u>Hearing on H.B. 1071 Before the House Natural Resources Committee</u>, 61st N.D. Legis. Sess. (Jan. 16, 2009) (Attachment 3).[5]

### 2. The 1981 amendments

In 1981, § 47-16-39.1 was amended to provide that, if an operator under an oil and gas lease failed to pay royalties due the mineral owner or its assignee within 150 days of when oil and gas was first produced and marketed, the unpaid royalties would thereafter bear interest at the rate of 18%. Also, a separate provision was added allowing the prevailing party in any action to enforce the statute to recover attorney's fees and costs. 1981 <u>N.D. Sess. Laws</u>, ch. 466, § 1.

The legislative history for the 1981 amendments clearly indicates that the reasons for requiring interest to be paid at 18% after 150 days and for payment of attorney's fees and costs were twofold. Mineral owners were complaining that well operators were continuing to delay payments of royalty without good excuse so that they could use the suspense money "interest free" and that the remedy enacted in 1961 of authorizing the courts to cancel leases had proved to be ineffective because the courts were reluctant to do so. The legislative history further makes clear that the 18% penalty interest and the 150-day deadline were compromises. A number of mineral owners and their attorneys proposed a 60-day deadline while industry favored 180 days.

Finally, with respect to an issue that will be addressed later, it is clear from the 1981 legislative history that the general belief was the 18% penalty interest would not begin to accrue until after the 150th day and this was also part of the compromise. <u>Hearing on H.B. 1071 Before the House Natural Resources Committee</u>, 61st N.D. Legis. Sess. (Jan. 16, 2009) (Attachment 2). In fact, this is likely the reason for use of the word "thereafter" in the operative language that was finally adopted:

---

[5] Both the Tanks and defendants have referenced portions of the legislative history for N.D.C.C. § 47-16-39.1. The legislative history that the court considered has been filed by the court at Doc. No. 132. The legislative histories that the court considered for the 1961 and 1981 legislative sessions were attachments to the history for the 2009 session.

In the event the operator under an oil and gas lease fails to pay oil or gas royalties to the mineral owner or his assignee within one hundred fifty days after oil or gas produced under the lease is marketed and cancellation of the lease is not sought, the unpaid royalties shall **thereafter** bear interest at the rate of eighteen percent per annum until paid.

1981 <u>N.D. Sess. Laws</u>, ch. 466, § 1 (emphasis added).

### 3. The 1995 amendments

Section 47-16-39.1 was next revised in 1995. The only substantive addition was the inclusion of an alternative interest provision for university and school lands. The remainder of the changes were stylistic. 1995 <u>N.D. Sess. Laws</u>, ch. 439, § 1.

### 4. The 2007 amendments

The next revision to § 47-16-39.1 took place in 2007. In the 2007 amendments, a clause was added to the sentence providing an exception for title disputes that stated: "however, the operator shall make royalty payments to those mineral owners whose title and ownership interest is not in dispute." In addition, the 18% penalty interest provision was amended to more affirmatively state that the "operator shall pay interest" at the 18% rate if royalty was not paid within the 150 days from the earlier language, which stated that the unpaid royalties would bear interest at that rate until paid. 2007 <u>N.D. Sess. Laws</u>, ch. 401, § 1.

The legislative history reflects that the reason for the first change was to make clear that operators could not rely upon a title dispute over the interests of one mineral owner to delay payment to other mineral owners whose interests were not in dispute. The reason for the second change appears to have been simply one of emphasis, *i.e.*, to more affirmatively state what the obligation was under the statute for paying 18% penalty interest on unpaid royalty after the 150 days. <u>Hearing on H.B. 1257 Before the House Natural Resources Committee</u>, 60th N.D. Legis. Sess. (Jan. 18, 2007).

To accomplish the latter change, the existing statutory language (which had been modified slightly in 1995 from that adopted in 1981) was amended to read as follows:

> If the operator under an oil and gas lease fails to pay oil or gas royalties to the mineral owner or the mineral owner's assignee within one hundred fifty days after oil or gas produced under the lease is marketed and cancellation of the lease is not sought, the ~~operator shall pay interest on the~~ unpaid royalties ~~shall thereafter bear interest calculated~~ at the rate of eighteen percent per annum until paid . . . .

2007 N.D. Sess. Laws, ch. 401, §1. Notably, in accomplishing this change, the word "thereafter" was deleted from the statute. However, there is nothing in the legislative history which suggests that the deletion of the word "thereafter" was intended to substantively change when interest would begin to accrue.

To jump ahead for a moment, the word "thereafter" was not reinserted in the statute until 2011, when it was pointed out during the legislative session that the language of the statute was ambiguous in terms of when the 18% penalty interest would begin to accrue, so the word was reinserted. Notably, the word "thereafter" was not present in the 2009 version of the statute.

### 5.     The 2009 amendments

Section 47-16-39.1 was again amended in 2009, and this is the version of the statute that applies in this case. The primary change made in 2009 was to make the 18% penalty interest provision applicable to unleased mineral interests as well as leased interests. In addition, language was added clarifying that the statute would not apply when minerals owners could not be located after reasonable inquiry. 2009 N.D. Sess. Laws, ch. 314, § 2.

The legislative history for the 2009 amendments is notable in two respects. The first is that industry representatives proposed lengthening the time period before interest would be required to be paid from 150 days to 200 days and also lowering the rate from 18% to 12%. Hearing on H.B. 1071 Before the House Natural Resources Committee, 61st N.D. Legis. Sess. (Jan. 16, 2009) (Attachment

4). In support of the proposed change, an oil and gas attorney testified about the increasing difficulty in meeting the 150-day deadline because of the increased amount of title work for many of the wells resulting from a larger number of acres being pooled together for a single well along with the additional 20 years of recorded title transactions that have to be reviewed for some wells. His testimony, as reported by the hearing minutes, was as follows:

> We locate the oil & gas owners, easement owners, surface owners, the mineral owners, anyone that owns an interest in the property. We determine the ownership interest, the % that everyone owns. We determine what all the problems are. These titles are extremely complex. In 1988 most of the wells were drilled on 160 acres or 320 acres or patterns. Now with the Bakken wells. What I could do in 1988 now takes 8 times as long or more. We also have another 20+ years being recorded. For instance, on one particular well, the title opinion is 362 pages. The well was drilled in July of 2007 and completed in September of 2007. To do the title opinion on this will [sic] the company hired a land company to build an abstract that took several months. The abstract is 12,000 pages, I read those 12,000 pages and prepare a summary that identifies owners. We have ten tracks, I have about 45 pages of owners just for this one well. I then go through all of the 169 leases. Then I go through and explain all the problems, estates, probates. I do a calculation - division of interests - for this well was about 40 pages. Then I send it to the company and they figure out which owners they can pay and which ones they can't. They have to input into their accounting system all the data. In this particular well was completed in September 07 and the title opinion was done in September 08. In this instance the owners didn't get paid for over a year. During that entire time work was done on the title. They are now being paid. *And they also got paid interest at 18% from 150 days*. This isn't unusual to have an opinion this long. The one I am working on now is longer. Our average opinions are around 150 to 180 pages. This one took me 11 weeks of Attorney hearing [sic] to prepare. There is a question on when you pay the unleased owners verses the leased owners. Typically everyone is going to be paid the same time.

Hearing on H.B. 1071 Before the House Natural Resources Committee, 61st N.D. Legis. Sess. (Jan. 16, 2009) (italics added). In addition, another industry representative testified about the difficulty in getting the legal work done given the volume of activity and the limited number of attorneys capable of doing the highly-specialized title examination. (Id.)

The legislative committee considering other proposed changes elected not to take up the industry's proposal, even though the testimony about the longer period of time it was taking to

complete the necessary title work for some wells does not appear to have been questioned. A competing viewpoint was the written testimony offered by Representative Meyer, who observed that oil companies were still getting the benefit of five months use of mineral owner money interest free:

> Chairman Porter and members of the Natural Resources Committee my name is Shirley Meyer and I represent District 36. I hope you will support HB 1071.

> A 1961 interim Natural Resources Committee created Section 47-16-39.1 of the North Dakota Century Code. I have provided you with copies of that interim study and also copies of the bill that amended that section in 1981. Please note how the interest in this section of the code rises and falls along with the oil actively [sic] in North Dakota.

> The history of this legislation is not only interesting, but gives you a background on an important law that has benefitted royalty owners in the past by giving the oil operator an incentive to get royalties paid by 150 days. *After that time frame an eighteen percent interest rate starts to accrue*. What brought this about in the eighties were operators delaying payment to royalty owners up to three years with the only remedy being District Court. The beneficiary of the use of this money should be the royalty owner because upon the sale of the oil, those monies are his. *While oil companies may see this as punitive, remember this does give the operator five months of using the money interest free.*

> HB 1071 expands this interest rate to include an unleased mineral interest owner. I believe the original intent of the law has always been to include all royalty owners and the unleased owners were inadvertently omitted from the language in this section. HB 1071 corrects this misconception and treats all royalty interests equal.

> The issue of delayed royalty payments is once again surfacing in our western counties with the increased drilling activity in the Bakken formation. Although many of these wells came in and were big oil producers, royalty owners are still waiting on their first royalty checks. Calls from constituents concerning this issue are becoming a weekly occurrence.

> I would urge you to adopt HB 1071[.]

Hearing on H.B. 1071 Before the House Natural Resources Committee, 61st N.D. Legis. Sess. (Jan. 16, 2009) (Attachment 1) (italics added).

The other notable point with respect to the 2009 legislative history is that, in all of the discussion about the industry's proposals to lengthen the 150-day time period and lower the interest rate as well as the proposal to apply the penalty interest provisions to unleased interests, there was no

discussion about the law having changed as to when interest would begin to accrue, much less a belief expressed that interest would begin to accrue from the first day of marketing the oil or gas as opposed to after the 150th day.  In fact, the contrary is true, including the italicized portions of the testimony of the oil and gas attorney and Representative Meyer as set forth above.

### 6.    The 2011 amendments

Section 47-16-39.1 was again revised in 2011 after the critical events in this case.  The following change was made:

> If the operator under an oil and gas lease fails to pay oil or gas royalties to the mineral owner or the mineral owner's assignee within one hundred fifty days after oil or gas produced under the lease is marketed and cancellation of the lease is not sought or if the operator fails to pay oil or gas royalties to an unleased mineral interest owner within one hundred fifty days ~~from initial~~ after oil or gas production is marketed from the unleased mineral interest owner's mineral interest, the operator thereafter shall pay interest on the unpaid royalties, without the requirement that the mineral owner or the mineral owner's assignee request the payment of interest, at the rate of eighteen percent per annum until paid . . . .

2011 N.D. Sess. Laws, ch. 265, § 6.  The legislative history reflects that the insertion of the word "thereafter" was at the request of the Oil and Gas Division of the North Dakota Industrial Commission to clarify what staff perceived to be an ambiguity under the language of the statute as it existed at the time (which was the 2009 language) as to whether the 18% interest begins to accrue after the 150th day or earlier when oil or gas was first marketed.  Hearing on H.B. 1241 Before the Senate Natural Resources Committee, 62nd N.D. Legis. Sess. (Mar. 10, 2011) (Attachment 8).  The court will return to this issue later.

## III.    DISCUSSION

### A.    Whether there was a "dispute of title" providing safe harbor for the late payment of royalty for the Lassen Well

#### 1.    Introduction

As noted earlier, Burlington's title attorney raised two issues with respect to the Tanks' interest. The first was the superiority of the two mortgages to the Murex Lease, with the recommendation that Burlington obtain a subordination. The second had to do with who was entitled to the payments of royalty as between the Tanks and FCS based on the mortgage provisions. Defendants claim that both issues raise disputes of title within the meaning of § 47-16-39.1's "dispute-of-title exception" and provide safe harbor from the penalties imposed by the statute.

## 2. Relevant statutory language

The relevant portion of the statutory language provides:

> This section does not apply when mineral owners or their assignees elect to take their proportionate share of production in kind, in the event of a **dispute of title existing that would affect distribution of royalty payments**, or when a mineral owner cannot be located after reasonable inquiry by the operator; however, **the operator shall make royalty payments to those mineral owners whose title and ownership interest is not in dispute**.

N.D.C.C. § 47-16-39.1 (2009) (emphasis added); 2009 N.D. Sess. Laws, ch. 314, § 2.

The most commonsense reading of this language, particularly in light of the remedial purposes of § 47-16-39.1 and the legislative history outlined earlier, is that the "dispute-of-title exception" should be applied narrowly and only when (1) there is an actual and substantial dispute of ownership; (2) the dispute of ownership materially "affects" the distribution of the royalty, *i.e.*, creates a real risk that the royalty could be distributed to the wrong person(s); and (3) the dispute of ownership is "existing," *i.e.*, the dispute could not have been readily resolved and is expected to continue for sometime into the future. See Acoma Oil Corp v. Wilson, 471 N.W.2d 476, 486 (N.D. 1991) (requiring payment of 18% interest under § 47-16-39.1 on the unpaid amount that was not in dispute but not on the portion that was in dispute); see generally Locken v. Locken, supra (discussing the rules of statutory construction set forth in N.D.C.C. § 1-02-39); Hulse v. Job Service North Dakota,

492 N.W.2d 604, 607 (N.D. 1992) ("'[E]xceptions to remedial legislation are strictly construed.'")

(quoting 3 N. Singer, Sutherland Statutory Construction, § 60.01 (5th Ed. 1992)).

### 3. Claim of "title dispute" based on the superiority of the FCS mortgages

Defendants make several arguments for why the superiority of the FCS mortgages created a

title dispute within the meaning of the "dispute-of-title exception." The first is that, since a title

attorney commented on the issue and recommended curative work, it must be a title dispute. The mere

fact that an issue has been raised by a title attorney, however, is not enough; the requirements of the

"dispute of title exception" must still be satisfied.

More substantively, defendants argue that the mortgages could affect Murex's ownership of

its lease interest if the mortgages were foreclosed. While this is undoubtedly correct,[6] the mere

possibility that Murex's working interest could be foreclosed upon did not present an "existing"

dispute over title. Absent a judgment of foreclosure, FCS had only a lien interest under North

Dakota law. See, e.g., Yttredahl v. Federal Farm Mortgage Corp., 104 N.W.2d 705, 709-10

(N.D.1960) (per curiam on petitions for rehearing); N.D.C.C. § 35-03-01.2.

Defendants also argue there was a title dispute because the existence the two mortgages

constituted a breach of a covenant against encumbrances in the Murex Lease. As discussed in the

court's earlier order denying preliminary relief, however, Murex's remedy for a breach of a covenant

against encumbrances under North Dakota law (aside from possibly being able to rescind the lease,

which it did not attempt and instead continued to claim the benefits of the lease) was to (1) pay off

the mortgages, sue for damages, and possibly retain the royalty as an offset, or (2) possibly being able

to pay the royalty directly to FCS in reduction of the outstanding mortgage balances if FCS was

---

[6] See, e.g., 4 E. Kuntz, A Treatise on the Law of Oil and Gas, § 5.3 (Matthew Bender Rev. Ed.) ("Kuntz") ("Where an oil and gas lease is granted after a mortgage has been granted on the land, a foreclosure will ordinarily destroy the rights of the lessee under the lease.").

willing to accept early partial payments. Tank, 2011 WL 2600458, at *10.[7] And, even though the

payment of the royalty could have been impacted if Murex had exercised one of these contractual

remedies, the problem for defendants argument here is that Murex had not chosen to enforce the

covenant, so there was no "existing" dispute of ownership. Murex retained the working interest and

the royalty belonged to the Tanks (at least so long as it had not been assigned to FCS, which is a

different subject and one that is addressed in the next section). Cf., Headington Oil Co., L.P. v. White,

287 S.W.3d 204, 211-12 (Tex. Ct. App. 2009) (distinguishing contractual disputes from disputes over

ownership for purposes of application of a "dispute of title" exception to paying prejudgment interest);

Stable Energy, L.P. v. Newberry, 999 S.W.2d 538, 554 (Tex. Ct. App. 1999) (same).

In other words, if defendants (or, perhaps, more correctly here Murex) wanted to enforce the

covenant by exercising one of the available contractual remedies, then they simply should have done

it. What defendants were not permitted to do under North Dakota law is what was done here, *i.e.*,

retain the royalty under the guise of a "title dispute," demand a subordination that FCS was not

---

[7] In the court's prior order denying preliminary relief, the court observed:

> The remedy that most courts have concluded is appropriate for a breach of a covenant against encumbrances, at least when the encumbrance is a lien, is damages in the amount paid by the party suffering the breach to satisfy the lien or, in the absence of such a payment, nominal damages. See generally 21 C.J.S. Covenants § § 59 & 86 (database updated June 2011). In North Dakota, the remedy is provided by statute. N.D.C.C. § 32–03–12 reads as follows:
>
> **§ 32-03-12. Damages for breach of covenant against encumbrances**
> The detriment caused by the breach of a covenant against encumbrances in a grant of an estate in real property is deemed to be the amount which has been expended actually by the covenantee in extinguishing either the principal or interest thereof, not exceeding in the former case a proportion of the price paid to the grantor, equivalent to the relative value at the time of the grant of the property affected by the breach as compared with the whole, or, in the latter case, interest on a like amount.
>
> Also, while the court has not found any authority one way or the other, there may be an argument that if an oil and gas lessee can satisfy the lien and sue for damages, it should also be able to direct the royalty payments as they become due to the lienholder until the lien has been satisfied.

Tank, 2011 WL 2600458, at *10.

obligated to give and might never provide, and continue at the same time to claim the benefits of the Murex Lease.

Finally, this assumes there was a covenant against encumbrances in the Murex Lease and that it was breached - both of which are disputed by the Tanks. Because the court concludes that the outstanding mortgages did not create a dispute of title within the meaning of the "dispute-of-title exception," the court need not resolve what it considers to be a very close question.[8]

> **4.** **Claim of "title dispute" based on mortgage language addressing the payment of royalty**

Defendants also argue that the mortgage provisions addressing the payment of royalty created a "title dispute" that provided safe harbor. More particularly, their argument appears to be that the mortgage provisions created doubt as to who was entitled to payment of the royalty thereby creating a question as to its ownership.

_____

[8] There are two sections of the Murex Lease that are relevant to the determination of whether it provides a covenant against encumbrances. One is the "conveyancing" clause, which reads in relevant part as follows:

> WITNESSETH, That the Lessor, for and in consideration of . . . the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter contained, has **granted**, demised, leased and let, and by these presents does **grant**, demise, lease and let exclusively unto the said Lessee, the land hereinafter described, with the exclusive right for the purpose of mining, exploring by geophysical and other methods, and operating for and producing therefrom oil and all gas of whatsoever nature . . . .

(Doc. No. 18-1) (emphasis added). The other is paragraph 14, which reads:

> 14. Lessor hereby **warrants and agrees to defend the title to the lands** herein described, and agrees that the Lessee shall have the right at any time to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof, and the undersigned Lessors, for themselves and their heirs, successors and assigns . . . .

(Doc. No. 18-1) (emphasis added).

Defendants argue that a warranty against encumbrances is implied under North Dakota law by the use of the word "grant" in the conveyancing clause as well as by the "warrants and agrees to defend the title to lands" language in the warranty clause in paragraph 14. The Tanks' argument is that the implied warranties argued by the defendants with respect to the use of the word "grant" are limited to fee conveyances and have no applicability to oil and gas leases. They also argue that the language of the lease speaks directly to what happens if there are outstanding encumbrances and limits the lessee's rights and remedies to those set forth in the second half of paragraph 14. As noted by the court's discussion of this issue in its earlier decision denying preliminary relief, there is conflicting authority from other jurisdictions that supports both parties' arguments, and the North Dakota Supreme Court has not yet ruled on these issues. Tank, 2011 WL 2600458, at **5-10.

23

The Tanks disagree.  They argue that only disputes over the ownership of the mineral acres provide safe harbor.  In particular, they point to the language of the "dispute-of-title exception" which states: "the operator shall make royalty payments to those mineral owners whose title and ownership interest is not in dispute."

The court is not so sure.  The literal language of the statute does not foreclose the interpretation that it encompasses disputes over the ownership of the royalty as well as ownership of the mineral acres.  Morever, a royalty interest is a separate property interest that can be conveyed under North Dakota law, which creates the possibility of there being disputes over royalty comparable to those involving the mineral acres.  See, e.g., Acoma Oil Corp. v. Wilson, supra; Aure v. Mackoff, 93 N.W.2d 807 (N.D. 1958).

In this case, it does not make a difference, however.  This is because there are other reasons why the concerns raised by the title attorney relating to the payment of the royalty do not invoke § 47-16-39.1's safe harbor provisions.

In particular, the operative language of the 1980 mortgage was the following:

> 12.      The mortgagee shall, at its option, receive all sums which may accrue to or be realized by the mortgagor from eminent domain proceedings or from the sale, lease, development or removal of minerals, including but not limited to oil, gas, coal, lignite, rock, stone, gravel, sand, clay, peat, and earth.  *Such sums are hereby assigned by the mortgagor to the mortgagee to be applied on the mortgagee debt as the mortgagee shall elect.*  Nothing herein shall obligate the mortgagee to accept such sums or constitute consent to such sale, lease, development or removal, or obligate the mortgagee to receive any payment during foreclosure or during any redemption period.

(Doc. No. 104-2, p. 7) (emphasis added).   Burlington's title attorney construed this language to mean that the "Mortgage assigns all proceeds attributable to mineral development to the Mortgagee."  (Doc. No. 104-5).

If this interpretation was correct in light of North Dakota law, then there would have been no dispute over the ownership of the royalty; it was assigned to FCS. And, if that was the case, then Burlington could simply have paid the royalty to FCS and, if FCS did not want it, it could either have turned it over to the Tanks or returned it to Burlington and advised that the payments should be made directly to the Tanks. Further, the fact that the language of the 1999 mortgage may have been somewhat different would have been academic since the 1980 mortgage was all encompassing.

Unfortunately, there is no case law in North Dakota that expressly addresses the legal effect of the language of the 1980 mortgage, which, on its face, appears to make a present assignment of the royalty to FCS - at least so long as the mortgage debt remains outstanding. However, the likelihood that Burlington could be held liable twice if it had directed the royalty payments to FCS appears to have been non-existent given what the Tanks and FCS agreed to in the 1980 mortgage and their continuing contractual relationship that prohibited FCS from simply pocketing the money and required that it either (i) credit the payments against the Tanks' loan balance, (ii) turn the payments over to the Tanks, or (iii) return the payments to Burlington and advise that the payments should be made to the Tanks.[9]

---

[9] There is North Dakota caselaw, however, that addresses assignments of rents. And, unlike what may be the law in some states, assignment-of-rent provisions in mortgages are enforceable in North Dakota separate from having to foreclose on the mortgage, with one proviso which is that they may not be enforceable during the period of redemption after a mortgage has been foreclosed. East Grand Forks Federal Sav. & Loan Ass'n v. Mueller, 198 N.W.2d 124 (N.D. 1972) ("Mueller"); Skinner v. American State Bank, 189 N.W.2d 665 (N.D. 1971); see In re Fluge, 57 B.R. 451, 454 (Bkrtcy. D.N.D. 1985); see generally Grant S. Nelson and Dale A Whitman, 1 Real Estate Finance Law, § 4.35 (5th ed. 2007).

However, what is not clear is whether the language purporting to create a present assignment of rents in a mortgage is immediately operative or whether some additional step must be taken by the mortgagee to enforce the language. See id. If some additional step is required, then it appears unlikely that a lessee could be held liable to a mortgagee for rent payments made to the mortgagor in the absence of receiving notice that the mortgagee has elected to enforce the assignment-of-rents provision. See In re Fluge, 57 B.R. at 454; Mueller, 198 N.W.2d at 126; see generally Restatement (Third) of Property (Mortgages) § 4.2 comment d (1997); Restatement (Second) Contracts § 338 (1981).

(continued...)

But, even if there was some question regarding who would be entitled to the royalty payments as between the Tanks and FCS, it could readily have been resolved in several ways, not the least of which was simply making the royalty checks payable to both the Tanks and FCS.[10] Consequently, any

---

[9](...continued)

And, if the same law applies to payments of royalty, then it seems unlikely that Burlington could have been exposed to liability to FCS if it had made the royalty payments to the Tanks, absent receiving notice that FCS had elected to receive the royalty payments.

    This applies with even more force to the 1999 mortgage, where the operative language was:

    11.    Minerals and Eminent Domain.  In this paragraph 11, "minerals" includes but is not limited to oil, gas, coal, lignite, rock, stone, gravel, sand, clay, peat and earth.  Mortgagee shall, at its option, receive all sums which may accrue to the Mortgagors from eminent domain proceedings or from the sale, lease, development or removal of minerals in and under the premises.  These sums shall be applied to the indebtedness as Mortgagee elects.  Nothing in this Mortgage, however, obligates Mortgagee to accept these sums or constitutes consent to the sale, lease, development or removal of minerals, or obligates Mortgagee to receive any payment during foreclosure or a redemption period.

(Doc. No. 104-2, p. 2).  In her opinion, Burlington's title attorney stated with respect to this language: "This Mortgage provides that the Mortgagee, at its option, may elect to receive all proceeds from mineral development." (Doc. No. 104-5).  In the absence of Burlington having been put on notice that FCS had exercised its election to receive the royalty, it appears improbable that Burlington could have been held liable twice for payments of royalty made directly to the Tanks given the authority cited above.


[10] The use of joint checks is common in the construction industry for payments by owners to contractors and their material suppliers given the lien interests of the latter, with the courts holding that joint checks are an acceptable form of payment in this situation.  E.g., SFR, Inc. v. Comtrol, Inc., 177 P.3d 629, 635-36 (Utah Ct. App. 2008); Brown Wholesale Elec. Co. v. Beztak of Scottsdale, Inc., 788 P.2d 73, 76-77 (Ariz. 1990); SKW/Eskimos, Inc. v. Sentry Automatic Sprinkler Co., 723 P.2d 1293, 1297 n.4 (Alaska 1986); Post Bros. Const. Co. v. Yoder, 569 P.2d 133, 135-37 (Cal. 1977).  As explained by the Arizona Supreme Court:

    The joint check rule reflects a widespread practice in the construction industry that allows owners and general contractors to protect themselves from lien foreclosure by materialmen whom subcontractors have failed to pay.  The issuance of a check payable jointly to the subcontractor and the materialman enables the materialman to withhold endorsement until he is assured that the subcontractor's account with him is or will be satisfied from the proceeds of the check.  This may be accomplished in various ways, including the use of gentlemen's agreements or more formal escrow arrangements.  The practice of issuing joint checks protects both the owner/general contractor and the materialman, because each has an interest in ensuring that the materialman is paid.

Brown Wholesale Elec. Co., 788 P.2d at 76.

    The situation here is comparable. The Tanks and FCS both have an interest in the subject property arising out its hypothecation by the mortgage contract, as well as a continuing contractual relationship. N.D.C.C. §§ 35-03-01.1(1) & 35-03-01.2. Like subcontractors and materialmen in the construction setting, the Tanks and FCS's relationship is such that they can be expected to work out between themselves how the royalty payments should be handled for checks made payable to them jointly, including whether the payments should be applied to the mortgage balance.

    Outside of the construction setting, courts have also afforded protection to those issuing joint checks in other circumstances that are analogous here as well. E.g., Smith v. Haggard, 961 So.2d 337, 339 (Fla. Dist. Ct. App. 1st Dist. 2007) (check issued by purchaser of property payable jointly to the seller and its mortgagee held to be proper payment); Apple v. Miami Valley Production Credit Ass'n, 614 F. Supp. 119, 124 (S.D. Ohio 1985) (concluding that grain purchaser properly made checks payable jointly to the plaintiff farmer and the holder of a security interest in the grain); Christensen v. Farmers Ins. Exchange, 669 P.2d 1236, 1238 (Utah 1983) (noting the Utah court's approval of an

(continued...)

question as between the Tanks and FCS as to who was entitled to receive the royalty was not a qualifying dispute of title within the safe-harbor provisions of § 47-16-39.1 given that it was readily resolvable (*i.e.*, should not have been "existing") and because there was no real potential for defendants being exposed to multiple liability.

Morever, the legislative history of § 47-16-39.1 as outlined earlier supports this construction. One of the complaints that the legislators clearly intended to address was the practice of some operators placing mineral owners' royalty interests "in suspense" for the slightest of reasons so the money could be used by them "interest free" for other purposes. In allowing an exception for title disputes, the discussion in the legislative history centered around disputes of ownership of minerals that could not reasonably be resolved within a short period of time and likely would require court action. There was no mention of the rather common situation where a mineral owner has a mortgage, much less any suggestion that operators could dither over the readily resolvable problem of who should be entitled to payment as between a mineral owner and a mortgagee and be able to claim this as a title dispute. In other words, the legislative history supports the construction that the "dispute-of-title exception" is reserved for more substantial disputes.

---

[10](...continued)
automobile insurance carrier issuing separate checks, one for the benefit of the injured party alone to cover general damages and another made payable jointly to the injured party and the no-fault insurer to cover prior no-fault payments); see Bremyer v. School Ass'n of Swedish Evangelical Mission Conference of Kan., 122 P. 104, 106 (Kan. 1912) (mortgage holder limited to the collection of interest on the outstanding mortgage debt to the time of tender of checks made payable by the fire insurance carrier jointly to the mortgagor and the mortgagee).

While there are no cases in North Dakota on point, the court concludes that North Dakota courts would hold that a check by an operator to both the mineral owner and its mortgagee under these circumstances would be a sufficient tender of royalty to avoid liability under § 47-16-39.1.

**B.**     **When the 18% penalty interest under § 47-16-39.1 begins to accrue**

The Tanks contend that they are entitled to payment of 18% interest on all unpaid royalty dating back to the date of the first marketing of oil or gas - at least under the 2009 version of § 47-16-39.1 that applies in this case. Defendants disagree. They argue that interest only began to accrue on any unpaid royalty beginning with the 151st day. The operative language from the 2009 version of the statute reads as follows:

> If the operator under an oil and gas lease fails to pay oil or gas royalties to the mineral owner or the mineral owner's assignee within one hundred fifty days after oil or gas produced under the lease is marketed and cancellation of the lease is not sought . . . , the operator shall pay interest on the unpaid royalties at the rate of eighteen percent per annum until paid . . . .

N.D.C.C. § 47-16-39.1 (2009); 2009 N.D. Sess. Laws, ch. 314, § 2.

Here, the court agrees with defendants for two reasons. First, while the operative language in 2009 may have been ambiguous as pointed out in the 2011 legislative history discussed earlier, the construction most in keeping with the history of changes to § 47-16-39.1 clearly favors defendants' interpretation. As recounted earlier, the 18% penalty interest provision was first included in the statute in 1981. At that time, the word "thereafter" was included in the statutory language and its obvious purpose was to make clear that interest would begin to accrue only after the 150th day. And, while the word "thereafter" was deleted from the statute in 2007 and did not reappear until 2011, its deletion in 2007 was the result of a tweaking of the statutory language for other purposes and was not intended to have substantive consequences.

Second, there is nothing in the legislative history for the 2009 amendments that reflects an understanding by the legislators that there had been any change in when interest would accrue by the 2007 amendments. In fact, as noted earlier, the 2009 legislative history includes several uncontradicted references to interest not accruing until after the 150th day.

C.      **The Tanks' claim for cancellation of the Murex Lease**

1.      **The relevant statutory language and prior case law**

As noted earlier, lease cancellation was the first remedy provided by § 47-16-39.1 for nonpayment of lease royalty and predates the inclusion of the provisions for 18% penalty interest and attorney's fees and costs.  The operative language from the 2009 version of the statute relating to lease cancellation reads as follows:

> The obligation arising under an oil and gas lease to pay oil or gas royalties to the mineral owner or the mineral owner's assignee, or to deliver oil or gas to a purchaser to the credit of the mineral owner or the mineral owner's assignee, or to pay the market value thereof is of the essence in the lease contract, and breach of the obligation may constitute grounds for the cancellation of the lease in cases where it is determined by the court that the equities of the case require cancellation.

N.D.C.C. § 47-16-39.1 (2009); 2009 N.D. Sess. Laws, ch. 314, § 2.

This is not the first time this court has dealt with a claim for lease cancellation pursuant to § 47-16-39.1.  The court addressed the issue in an unreported decision in Imperial Oil of North Dakota, Inc. v. Consolidated Crude Oil Co., Civ. No. A4-82-12 (D.N.D. May 23, 1986).  And, as noted by the Eighth Circuit later on appeal, this court considered six factors in deciding in that case that the lease should be cancelled:

> The district court next discerned from a review of North Dakota law six factors to be considered in determining whether cancellation is an appropriate remedy for nonpayment of royalties:
> > (1) whether the lessee consistently made payments according to the provisions of the lease; (2) whether the failure to pay royalties resulted from the lessee's negligence; (3) whether the lessee acted in good faith; (4) whether the lessor failed to notify the lessee of the nonpayment and therefore has unclean hands; (5) whether the lessee attempted to remedy the deficiency after learning of the nonpayment; and (6) whether the lessor accepted payment.

Imperial Oil of North Dakota, Inc. v. Consolidated Crude Oil Co., 851 F.2d 206, 210 (8th Cir. 1988).

On appeal, Imperial Oil made several arguments for why the statute should not have been applied as broadly as it was by this court in ordering that the lease be cancelled. The Eighth Circuit rejected these arguments, stating the following:

> Flying J's equity argument is essentially that cancellation of the lease was not "fair" and that it results in a "windfall" to Imperial. Flying J asserts that because cancellation is traditionally an equitable remedy, Imperial should have been required by the district court to demonstrate alone that a legal remedy such as damages would have been inadequate. This is so, according to Flying J, because cancellation of the leases renders a forfeiture, and equity abhors a forfeiture.

> It is true that the cancellation of the leases caused a forfeiture. The district court estimated the loss to Flying J caused by the cancellation to be approximately $691,463.00. Slip op. at 12. The cancellation, and accordingly, the loss, was caused by Flying J's failure to pay Imperial slightly more than $12,000.00 in royalties. This remedy is undoubtedly harsh and one that may not obtain under common law principles of equity considered alone. But Flying J's equity argument overlooks the critical element of this case: the applicable North Dakota statute.

> Section 47-16-39.1 represents a judgment by the North Dakota legislature that traditional damage remedies are simply inadequate to protect mineral owners' royalty interests. Accordingly, traditional principles of equity do not apply here; the legislature has supplanted common law equity with its own weighing of equitable principles and has determined that the nonpayment of royalties may be grounds for cancellation of a mineral lease. This conclusion is clear from a review of the legislative history of § 47-16-39.1, which reveals that the statute was enacted as a means of increasing the bargaining power of landowners in their dealings with major oil companies concerning rights under oil and gas leases. A legislative research committee drafted the initial form of the statute. This committee attached to its proposed legislation a report on its study of North Dakota oil and gas law and its recommendations regarding the need for legislation. In this report, the committee stated that it "deemed it desirable to better protect correlative rights by finding ways to more nearly equalize the bargaining power of the landowners when dealing with major oil companies in matters relating to rights under oil and gas leases." Legislative Research Comm., Report to the Legislature, at 42 (1961). Accordingly, the committee's recommendations included:

>> a bill to make the obligation to pay oil and gas royalties due a mineral owner the essence of the lease contract and to make the breach of the obligation to promptly pay such royalties grounds which the court, in its discretion, might use as the basis for cancellation of the oil and gas lease. A number of land owners reported at times there appeared to be an unreasonable lag in the payment of royalties and since their only apparent remedy was to sue in the courts for a recovery of the royalties due, they felt this was not sufficient penalty to ensure conscientious efforts to make prompt payments. In the Committee's opinion, the proposed bill would make the failure to promptly

30

> pay royalties a more serious matter. [B]ut since cancellation would be of the discretion of the courts, it would not unduly penalize a lease operator if he has reasonable grounds for failing to make prompt payment.
>
> Id. On the basis of this legislative history, the district court concluded that the North Dakota legislature intended to make cancellation available as a remedy for the nonpayment of royalties in appropriate cases even where a damages remedy might be adequate. Substantial deference is due the district court's interpretation of the law of the state in which it sits, <u>Union National Bank v. Farmers Bank</u>, 786 F.2d 881, 885 (8th Cir.1986), and we find no error in the district court's interpretation of N.D.Cent.Code § 47-16-39.1.

<u>Id.</u> at 210-11.

While section 47-16-39.1 has been amended several times since this court last applied it in <u>Imperial Oil</u>, the changes do not materially impact what this court and the Eighth Circuit concluded are relevant in determining whether or not a lease should be canceled. That being said, the court does not read either this court's or the Eighth Circuit's decision in <u>Imperial Oil</u> as holding that the six factors referenced earlier are the only ones that can be considered. Rather, given the breadth of the statutory language, anything that materially bears upon the equities can be considered, including, for example, the fact that the statute now provides an alternative, less-drastic remedy of payment of an 18% penalty as well as the opportunity to collect attorneys fees and costs.

Before turning to the facts of this case, it is helpful also to consider the one North Dakota Supreme Court case that has addressed a claim for lease cancellation pursuant § 47-16-39.1, which is <u>West v. Alpar Resources, Inc.</u>, 298 N.W.2d 484 (N.D. 1980). In that case, which was decided prior to the addition of the 18% penalty interest and attorney's fees and costs provisions, there was a dispute between the developer and mineral owner over the amount of royalty to be paid. The developer took the position that it was entitled to deduct certain gas-processing expenses before calculating the amount of royalty due and the mineral owner disagreed contending that the royalty had to be paid on the gross proceeds from the sale of the gas without deduction of expenses. <u>Id.</u> at

485-86.  The mineral owner sued and part of the relief requested was cancellation of the lease pursuant to § 47-16-39.1 based on the developer's failure to pay any royalty until the mineral owner signed a division order containing language that permitted the developer to deduct certain production expenses.  After the lawsuit was commenced, the developer did tender royalty payments after deduction of the gas-processing expenses that the mineral owner then cashed pursuant to an understanding that the mineral owner was not waiving his claim that a greater amount of royalty was due.  Id.

The trial court in <u>West</u> agreed with the developer's position with respect to the deduction of the gas-processing expenses.  The court then went on to conclude that equity would not permit lease cancellation because the royalty payments were legitimately disputed by the parties.  Id. at 486, 492.  On appeal, the Supreme Court reversed on the issue of whether the gas-processing expenses could be deducted, but, nevertheless, affirmed on the lease cancellation issue.  After reciting the fact that the district court denied the lease cancellation claim on the grounds that there was a legitimate dispute over the payment of the royalty, the court appeared to agree and then added an additional reason for denying lease cancellation.  The court stated:

> In addition to the legitimate dispute between the parties as to the amount of royalty payments to be made, there is an additional circumstance which is pertinent to this issue.  Subsequent to the commencement of the lawsuit, Alpar tendered, and the Wests accepted, royalty payments calculated on the basis of Alpar's interpretation of the lease.  The Wests received such royalty payments subject to their claim for additional royalty payments based upon their interpretation of the lease, and, therefore, their acceptance of such royalty payments did not constitute a waiver of their claim. However, their acceptance of such royalty payments was inconsistent with their intent to and request for a cancellation of the lease under Section 47-16-39.1, N.D.C.C. Under such circumstances, we do not believe that the district court abused its discretion in determining that equity would not require a cancellation of the lease under Section 47-16-39.1, N.D.C.C.

Id. at 492.

## 2. Cancellation of the Murex Lease is not appropriate in this case

The Tanks make a number of arguments for why the court should cancel the lease. Most broadly, they contend that the passage of approximately 19 months from when oil royalty was first due for oil first marketed in November 2009 to when royalty was finally paid by Burlington in July 2011, coupled with the lack of a valid reason for nonpayment, is exactly the type of abuse that the statutory remedy of lease cancellation was intended to address. They cite to a Louisiana case where the court concluded that lease cancellation was an appropriate remedy for a fifteen month delay in payment of royalty where there was no "reasonable dispute as to those entitled to receive the royalties, or the amount due each . . . ." Melancon v. Texas Co., 89 So.2d 135, 142 (La. 1975). They also rely upon this court's cancellation of the lease in Imperial Oil.

After careful consideration, the court concludes that the more relevant period for consideration in this case is from when the royalty was first due for oil marketed in November 2009 to no later than September 23, 2010,when the Tanks acknowledge they orally advised Burlington that they considered the lease to have terminated for untimely payment of royalty. At least as of that point - if not sooner, any payment of royalty by Burlington would likely have been rejected by the Tanks, given their repudiation of the lease and their rejection of the tenders of royalty made in October and November 2010 consistent with that position. Once the Tanks treated the lease as having terminated, this muddied the water sufficiently in terms of the respective rights and obligations of the parties that any failure to tender royalty to the Tanks after that was beside the point. Cf. West, 298 N.W.2d at 492; N.D.C.C. § 31-11-05(23) ("The law neither does nor requires idle acts.").[11]

---

[11] The Tanks contend that the reason why they rejected the payment of royalty was so that they would not run

(continued...)

Focusing primarily then upon the 10-month period from the first marketing of oil to September 23, 2010, it appears that most of this time was consumed by: (1) Burlington waiting for the preparation and completion of the title opinion, the length and complexity of which appears to have been driven mainly by the large amount of acreage pooled together for the Lassen Well by the North Dakota Industrial Commission; (2) Burlington digesting the information set forth in the title attorney's lengthy opinion; and (3) Burlington making arrangements for the sizeable amount of curative work recommended by the title attorney. And, while it appears that Burlington could have moved its consideration of the Tanks' interests along faster,[12] the court does not believe the length of the delay to be unduly excessive and enough to justify cancellation, at least absent some indication, amounting

---

[11](...continued)
into the problem faced by the minerals owners in <u>West</u> and be deemed to have waived their right to lease cancellation. They argue that Burlington should have agreed that their receipt of the royalty would not constitute a waiver of their right to lease cancellation. However, the Tanks have not cited to any authority holding that Burlington was under any obligation to so agree. Further, since it was Murex's lease, Burlington would have been understandably hesitant to take any action that might compromise Murex's defenses.

The Tanks also argue that, in the event of lease cancellation, they would have been entitled to a cost-free royalty pursuant to N.D.C.C. § 38-08-08(1). Consequently, according to the Tanks, Burlington should have tendered the lesser of (1) the royalty due under the lease or (2) the royalty due under N.D.C.C. § 38-08-08(1) during the period of time that lease cancellation was being disputed. While this argument has certain force and logic, § 47-16-39.1 does not address this situation and there was no case law holding that Burlington had to pay the lesser of these two royalties until the argument over lease cancellation was resolved in order to avoid cancellation of the lease. In fact, <u>West</u> suggests the contrary. Also, just as the Tanks were reluctant to accept a tender of royalty for the lease amount because it might be deemed a waiver of their claim for lease cancellation under <u>West</u>, Burlington would likely have been reluctant to tender an amount consistent with the lease being cancelled for the same reasons, particularly since it was Murex's lease.

[12] For example, there is no evidence that anyone from Burlington contacted Murex to determine whether it was concerned about the outstanding mortgages. If Murex had been contacted, it may have said "don't worry about it." On the other hand, if Murex was concerned and gave the matter any thought, it likely would have gone back to see what it had done with respect to its own well. And, if that had been done, the unrecorded subordination sitting in Murex's well file may have been discovered and the issue resolved at that point.

The same holds true for Murex. Murex attempts in its briefing to foist responsibility off on Burlington by contending that Burlington was responsible for making the payments and that it had no idea Burlington was delaying payment until it obtained a subordination. The Tanks, however, served Murex in August 2010 with a notice of termination of the lease and there is nothing in the record indicating that Murex contacted Burlington to find out why the Tanks' royalty was not being paid. Again, if Murex had done so, the issues that held up the payment of the royalty may have then been resolved without all of the back and forth between Burlington, on the one hand, and FCS and the Tanks, on the other, that occurred later.

to more than surmise and conjecture, that Burlington placed the Tanks' interest in suspense simply to take advantage of "interest free" money or otherwise acted in bad faith.[13]

Here, the evidence is that Burlington put the Tanks' interests in suspense because its title attorney had raised the two issues previously discussed and recommended curative work. And, while the court has now concluded that the issues raised by the title attorney were not disputes of title within the meaning of § 47-16-39.1's "dispute-of-title exception" providing safe harbor from the statute's requirements, this was not clearly established at the time and, as evidenced by the briefing here, subject to good faith arguments to the contrary. Further, part of the recommended curative work was to protect Murex's lease interest relative to the Tanks' mortgagee, and Burlington, as the operator, understandably needed to be cautious in terms of how it proceeded so as not to compromise Murex's interests.

The Tanks argue that the fact Murex already had in its files a signed subordination agreement from FCS is demonstrative proof of defendants having acted in such a cavalier manner that lease cancellation is justified. However, the fact that Burlington's administration could have been better (including, perhaps, seeking title information from Murex early on and providing the information to its title attorney) does not, in balancing the equities in this case, justify lease cancellation. Further, even if Burlington had attempted to query Murex about the outstanding mortgages after receiving the comments from its title attorney, the court is not convinced the subordination would have been located much prior to the Tanks' declaration that they considered the lease cancelled after

_____

[13] Burlington argues that a showing of bad faith is a *sine qua non* for lease cancellation and cites this court's prior order denying preliminary relief as well as the Eighth Circuit's decision in Imperial Oil as authority. In making this argument, however, Burlington overstates what this court previously stated and also takes out-of-context the language it quotes from the Eighth Circuit's opinion. While the court agrees that the absence of bad faith (or conversely the presence of good faith) is a significant factor, there may be circumstances where a lengthy delay may be sufficient even if only the result of inadvertence. In concluding here that the Tanks are not entitled to lease cancellation, the court has balanced all of the equities and has not grounded its conclusion that lease cancellation is not justified solely upon the absence of demonstrable proof of bad faith.

allowing some time for Burlington to assimilate the lengthy title opinion, make judgments regarding what was required for the large number of comments made by the title attorney, then making an inquiry of Murex, and Murex having time to investigate and respond.

Finally, the Tanks argue that Burlington should have obtained a drilling opinion prior to starting drilling and that, if it had done so, the subordination and payment issues raised by its title attorney would have been identified sooner. However, there is no evidence that Burlington could have obtained an earlier opinion without impacting the date when drilling commenced. Rather, it is just as likely that Burlington would have had to delay the drilling if it first obtained a drilling opinion and that this would have pushed everything back, including when the Tanks would ultimately have received their royalty. In other words, it was just as likely that the Tanks stood to benefit by Burlington taking a chance and drilling the well without waiting for a drilling opinion.

For all of these reasons, the court concludes that lease cancellation is too drastic a remedy for the delay in payment of the royalty in this case. Rather, the more appropriate remedy is the payment of the 18% penalty interest after 150 days, which it appears Burlington has now paid, and possibly the assessment of some attorney's fees and costs. Cf. Imperial Oil, supra (upholding district court's cancellation of lease under an earlier version of § 47-16-39.1 where the failure to pay was intentional and lacking in "any good faith explanation"); Canik v. Texas Int'l Petroleum Corp., 308 So.2d 453 (La. Ct. App. 1975) (delay in payment of royalty in part attributable to completion of title work); Broadhead v. Pan Am. Petroleum Corp., 166 So.2d 329 (La. Ct. App. 1964) (delay of eight months in payment of royalty was not unreasonable where part of the delay involved efforts on the part of the defendants to undertake curative title work).[14]

---

[14] While the court believes for purposes of lease cancellation that the relevant time period is the approximately
(continued...)

### D.    The Kings Canyon Well

The briefing on the cross-motions for summary judgment did not address in any detail the Tanks' claim with respect to the Kings Canyon Well. The claim was mentioned briefly in the Tanks' brief in support of their motion for summary judgment and not at all in Burlington's briefing.

The court, in its earlier order denying preliminary relief, questioned Burlington's explanations for why the statutory royalty due on that well had not been paid, but denied preliminary relief for other reasons. Likely, it was the court's observations that resulted in Burlington subsequently paying the royalty due, including possibly the penalty interest at the rate of 18%. However, even with that, there remained the question of whether the Tanks were entitled to 18% penalty interest dating back to the first marketing of the oil and gas (which the court has now concluded they are not) and also the question of attorney's fees and costs, which is a subject that may need to be addressed further as discussed below.

## IV.    ISSUES THAT REMAIN TO BE DETERMINED

### A.    Whether Burlington correctly calculated and paid the royalty and interest due with respect to the Lassen Well

Because Burlington did not pay the royalty due to the Tanks from the Lassen Well as well as any penalty interest until after this case was commenced, there may remain issues regarding whether Burlington correctly calculated the amount of royalty and the interest that it paid. Consequently, in the order set forth below, the court will establish a timeline for resolution of these issues.

---

[14](...continued)

ten months from when oil and gas was first marketed to when the Tanks repudiated the lease, the court would reach the same conclusions even if the time period were longer for the reasons articulated in the court's earlier order denying preliminary relief where the court expressed doubt about the likelihood of the Tanks prevailing on the merits with respect to lease cancellation.

**B.** **Attorney's fees and costs**

### 1. The claim for lease cancellation and the other claims for relief

Section 47-16-39.1 provides for payment of attorney's fees and costs to the "prevailing" party. In this case, the Tanks have prevailed on the recovery of their royalty as well as interest at the rate of 18% with respect to the Lassen Well and presumably also the Kings Canyon Well. However, the Tanks have not prevailed on their request for lease cancellation with respect to the Lassen Well. Also, while Burlington paid the unpaid royalty along with 18% interest at some point after the court issued its order denying preliminary relief, the Tanks continued the litigation seeking lease cancellation as well as recovery of penalty interest at 18% dating back to the first date of oil or gas marketing.

This raises a question as to who, if anyone, is the "prevailing" party within the meaning of § 47-16-39.1, including what factors the court should consider in making that determination. Also, it raises a question regarding whether the court should limit an award of attorney's fees and costs to the party it deems the prevailing party because of the lack of success on some issues.[15]

### 2. Dismissal of Murex's counterclaim

There is also a separate dispute regarding attorney's fees with respect to Murex's counterclaim against the Tanks. The Tanks claim that they are entitled to attorney's fees because there was no basis for Murex's counterclaim and it was brought it bad faith.

---

[15] See Fuller v. Franks Petroleum, Inc., 501 So.2d 1024 (La. Ct. App. 2d Cir. 1987). In Fuller, the court awarded the mineral owner his attorney's fees and costs in successfully obtaining payment of royalty and interest. However, since that was accomplished early in the litigation, the court denied the attorney's fees and costs incurred thereafter in an unsuccessful pursuit of lease cancellation. Id. at 1032.

## C.  Liability of Murex

The Tanks seek to hold both Burlington and Murex responsible for the untimely payment of royalty on the production from the Lassen Well, including liability for penalty interest at the rate of 18% as well as attorney's fees and costs.  While Murex's potential liability in this case included lease cancellation (which the court has not ordered) as well as *contractual* liability for failing to timely pay royalty, there may be some question whether Murex has *statutory* liability for 18% penalty interest as well as attorney's fees and costs if the court determines that the Tanks are a prevailing party.  This is because § 47-16-39.1 only imposes liability for payment of 18% penalty interest upon an "operator," and here there may be some question whether Murex is an operator within the meaning of the statute since (1) Murex's working interest was pooled by the Industrial Commission together with other interests for the drilling of the Lassen Well, (2) the actual operator was Burlington, and (3) it does not appear that Murex entered into a joint operating agreement.  On the other hand, Murex is still the owner of the "operating rights" under its lease and claims the benefits of the lease.[16]

The court will not have to make any final determination with respect to Murex's liability to pay unpaid royalty if all of the royalty has been properly paid by Burlington.  Also, the court need not be concerned about whether Murex is an "operator" for purposes of payment of the 18% interest if all of the penalty interest has been properly paid by Burlington and the court does not have to reach the issue for purposes of either Murex's cross-claim against Burlington or for purposes of resolving any claim for attorney's fees and costs.

---

[16] Cf. Marla J. Williams, Performance Of The Lease Royalty Clause:  Whose Responsibility Is It?, 33B Rocky Mountain Mineral Law Special Institute 1, 9-10 (April 1993).

### D.    Murex's cross-claim

Murex has an outstanding cross-claim against Burlington that remains unresolved.  Given the nature of the claim, it may not be possible to finally resolve it until the issues noted above have been resolved.

### E.    Kings Canyon Well

The court is uncertain with respect to what issues remain with respect to this well, if any, as already discussed.

## V.    ORDER

For the reasons set forth above, it is hereby **ORDERED** as follows:

1.    The competing motions for partial summary judgment (Doc. Nos. 103, 106, & 109) are **GRANTED IN PART AND DENIED IN PART** consistent with this memorandum decision.  No party, however, is yet entitled to final judgment.

2.    The Tanks are to advise the court by a written filing on or before July 26, 2013, for both the Lassen and Kings Canyon wells whether they agree that the amounts of royalty and interest at issue have been correctly paid in accordance with the court's rulings and, if they do not agree, specifically why they contend the amounts paid are incorrect, aside from any disagreement with the court's rulings.[17]  If the Tanks fail to comply with this provision within the time frame specified, they will be deemed to have agreed that what has been paid in principal and interest is correct.  However, if the Tanks raise concrete issues with regard to the amounts of principal and interest that

---

[17]    It will not be sufficient for the Tanks to state that they do not know or have not yet considered the issues. At the hearing on the pending motions, the court advised the attorney for the Tanks that they needed to focus on these issues if they were going to contest the amounts that have been paid and they have had sufficient time now to do so.

have been paid, the court will schedule a conference call to set forth a schedule for resolution of the issues.

3.     If the Tanks indicate their agreement with the amounts of interest or royalty paid or fail to make the filing required above, then the schedule to resolve the remaining issues shall be as follows:

a.     Any party seeking recovery of attorney's fees and costs with respect to this action (including both the Lassen Well and the Kings Canyon Well) shall file on or before August 16, 2013, a motion seeking recovery of the fees and costs that complies with the requirements of Local Civil Rule 54.1 (including the filing of a verified statement of fees and expenses along with supporting documents) accompanied by a brief explaining why the party is entitled to attorney's fees and costs.  Absent further order from the court, any objections to the motions shall be filed on or before August 30, 2013, and any replies on or before September 6, 2013.

b.     Murex shall file on or before August 30, 2013, a brief outlining what it is claiming with respect to its cross-claim against Burlington and the legal reasons why judgment should be entered against Burlington for such amounts. Burlington shall file a response on or before September 13, 2013, and Murex shall file any reply on or before September 20, 2013.

Dated this 16th day of July, 2013.

                              /s/  Charles S. Miller, Jr.
                              Charles S. Miller, Jr.
                              United States Magistrate Judge