IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| Greggory G. and Tommie S. Tank, | ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER RE MOTIONS FOR** |
| | ) | **ATTORNEY'S FEES AND COSTS** |
| vs. | ) | |
| | ) | |
| Burlington Resources Oil and Gas | ) | |
| Company, LP, and Murex Petroleum | ) | |
| Corporation, | ) | |
| | ) | Case No. 4:10-cv-088 |
| Defendants. | ) | |

_____

I.   **BACKGROUND**

   A.   **The parties and the two wells**

   Plaintiffs Greggory G. Tank and Tommie S. Tank (collectively the "Tanks") own mineral

interests in the NW¼ of Section 35, Township 151 North, Range 96 West, in McKenzie County, North

Dakota.  The Tanks have leased this interest to Murex Petroleum Corporation ("Murex") (the "Murex

Lease").  The North Dakota Industrial Commission ("Industrial Commission") pooled the Tanks'

mineral acres and Murex's lease interest together with other acreage from Sections 26 and 35

controlled by third parties for purposes of drilling the Lassen Well #41-26H ("Lassen Well") in Section

26 by defendant Burlington Resources Oil and Gas Company, LP ("Burlington"), the well operator.[1]

   Plaintiff Greggory Tank also owns a mineral interest in 16.667 acres of land located in the

N½SE ¼ & E½SW¼ of Section 34, which is unleased.  The Industrial Commission pooled Tank's

unleased interest with other acreage in a separate unit for the drilling of the Kings Canyon Well #21-

_____

   [1] Burlington is a subsidiary of ConocoPhillips.  Some of the persons performing work for Burlington may have
been ConocoPhillips employees and, to that extent, both entities will be collectively referred to herein as "Burlington."

1

27H ("Kings Canyon Well") for which Burlington is also the operator.  Murex does not have an interest in the Kings Canyon Well pursuant to the Murex Lease.

      **B.**     **This action**

The Tanks commenced this action in state court in November 2010, and it was removed to this court in December 2010.  The initial complaint sought relief only for the untimely payment of royalty on production from the Lassen Well.  In an amended complaint, a claim was added in which Greggory Tank sought relief for the untimely payment of royalty on the Kings Canyon Well against Burlington only.

The Tanks in the amended complaint asked the court to cancel the Murex Lease on account of the untimely payment of royalty on production from the Lassen Well pursuant to N.D.C.C. § 47-16-39.1, which authorizes cancellation of an oil and gas lease for failure to make timely payments of royalty when the equities support cancellation.  As discussed in more detail later, defendants contend this was the only relief that the Tanks sought with respect to the Lassen Well (aside from the payment of costs and attorney's fees) and that the Tanks never requested the alternative remedy under § 47-16-39.1, which is payment of "penalty interest" at the rate of 18% when an operator fails to pay royalty within 150 days of when oil or gas produced from a well is first marketed.

With respect to the Kings Canyon Well, lease cancellation was never an issue since Greggory Tank's mineral interest was unleased.  The only relief that Greggory Tank sought with respect to the untimely payment of royalty with respect to the Kings Canyon Well was the payment of statutory royalty on the unleased interest required by N.D.C.C. § 38-08-08 as well as "penalty interest" at the rate of 18% interest pursuant to § 47-16-39.1.

In addition to the Tanks' claims, Murex filed a crossclaim against Burlington claiming Burlington should be held liable for damages Murex would suffer if the Murex Lease was cancelled

as well as for any other liability imposed upon Murex.  Also, Murex was granted leave to assert a counterclaim against the Tanks after it had initially answered their complaint in which Murex alleged that the Tanks had breached the Murex Lease by their failure to cooperate and by bringing this action.

### C.    The court's prior rulings and the remaining issue of attorney's fees and costs

Early on in the litigation, the Tanks filed a motion for a preliminary injunction seeking an order requiring interim payments of royalty pending final resolution of the action.  The court denied the Tanks' request.  In its order denying preliminary relief, the court expressed doubt over the likelihood of the Tanks prevailing on their claim for lease cancellation with respect to the Lassen Well.  On the other hand, the court also expressed doubt about the two "title dispute" defenses that defendants had raised, which, if valid, would have provided safe-harbor from any liability under § 47-16-39.1, including payment of "penalty interest."  With respect to the Kings Canyon Well, the court expressed doubt about the validity of the excuses offered by Burlington for the failure to make timely payment of royalty to Greggory Tank, but concluded that the extraordinary remedy of a preliminary injunction was not required because of the availability of monetary remedies.  In addition, the court offered to accelerate a trial on the Kings Canyon Well claim.  Tank v. Burlington Resources Oil and Gas, Co., L.P., No. 4:10-cv-088, 2011 U.S. Dist. Lexis 70238, 2011 WL 2600458 (D.N.D. June 28, 2011) ("Tank I").

Notwithstanding the court's hope that the litigation could then be resolved, the case continued. Following additional discovery, the parties filed cross-motions for summary judgment with respect to the issues in dispute over the untimely payment of royalty with respect to the Lassen Well and Greggory Tank asked for summary judgment on the similar claim with respect to the Kings Canyon Well.  In resolving these motions, the court's final resolution of the principal issues did not materially change from what it predicted the outcome would be in its order denying the preliminary injunction.

3

With respect to the Lassen Well, the court concluded that the Tanks were not entitled to cancellation of the Murex Lease based on the overall equities, but, on the other hand, rejected defendants' arguments for safe-harbor from any liability under §47-16-39.1.  With respect to the Kings Canyon Well, the court stated it was unsure what remained to be resolved given that Burlington claimed it had paid the royalty due with respect to that well and, perhaps, penalty interest.   In reaching these conclusions, the court also had to address when the 18% penalty interest began to accrue on unpaid royalties.  The Tanks argued that it was retroactive to the date of first marketing of the oil and gas.  Defendants argued it would not begin until the 151st day following the first marketing of the oil and gas.  The court agreed with defendants on that issue.   Tank v. Burlington Resources Oil and Gas, Co., L.P., No. 4:10-cv-088, 2013 U.S. Dist. Lexis 99204, 2013 WL 3766526 (D.N.D. July 16, 2013) ("Tank II").

Several issues remained to be resolved following the court's order on the competing motions for summary judgment.  One was whether Burlington, which professed to having paid the royalty due along with penalty interest some time after the court issued its order denying preliminary relief with respect to both wells, had correctly paid the amounts due.  It appears that this issue has been resolved by agreement of the parties with respect to both wells.

Another claim that remained unresolved was Murex's crossclaim against Burlington.  This has now been dismissed pursuant to a stipulation by defendants.

The last issue that the court left open and which is the subject of the current order is whether any of the parties are entitled to attorney's fees and costs.  Both the Tanks and defendants claim they are the "prevailing party" within the meaning of N.D.C.C. § 47-16-39.1 and are entitled to attorney's fees and costs as provided for in that section.  In addition, the Tanks are seeking recovery of attorney's

fees and costs related to Murex having to dismiss its counterclaim when it became clear that the facts no longer supported it.

Initially, the court ordered the parties to file their requests for attorney's fees and costs and brief the issues that the court would need to decide in ruling upon those requests. Later, after a further telephone conference with the parties, the court agreed to first decide who, if anyone, was entitled to an award of attorney's fees and costs and then sort out later how much would be awarded, if anything.

## II.    ATTORNEY'S FEES AND COSTS PURSUANT TO N.D.C.C. § 47-16-39.1

### A.    Governing law

#### 1.    N.D.C.C. § 47-16-39.1

For purposes of the discussion that follows, it is helpful first to set forth the version of N.D.C.C. § 47-16-39.1 that was in effect during the time relevant to this action:

> **§ 47-16-39.1. Obligation to pay royalties--Breach.** The obligation arising under an oil and gas lease to pay oil or gas royalties to the mineral owner or the mineral owner's assignee, or to deliver oil or gas to a purchaser to the credit of the mineral owner or the mineral owner's assignee, or to pay the market value thereof is of the essence in the lease contract, and breach of the obligation may constitute grounds for the cancellation of the lease in cases where it is determined by the court that the equities of the case require cancellation. If the operator under an oil and gas lease fails to pay oil or gas royalties to the mineral owner or the mineral owner's assignee within one hundred fifty days after oil or gas produced under the lease is marketed and cancellation of the lease is not sought or if the operator fails to pay oil or gas royalties to an unleased mineral interest owner within one hundred fifty days from initial oil or gas production from the unleased mineral interest owner's mineral interest, the operator shall pay interest on the unpaid royalties at the rate of eighteen percent per annum until paid, except that the commissioner of university and school lands may negotiate a rate to be no less than the prime rate as established by the Bank of North Dakota plus four percent per annum with a maximum of eighteen percent per annum, for unpaid royalties on minerals owned or managed by the board of university and school lands. Provided, that the operator may remit semiannually to a person entitled to royalties the aggregate of six months' monthly royalties where the aggregate amount is less than fifty dollars. The district court for the county in which the oil or gas well is located has jurisdiction over all proceedings brought pursuant to this section. The prevailing party in any proceeding brought pursuant to this section is entitled to recover any court costs and reasonable attorney's fees. This section does not apply when mineral owners or their assignees elect to take their proportionate share of production in kind, in the event of a dispute of title existing that would affect distribution of royalty payments, or when a mineral owner cannot be located after

reasonable inquiry by the operator; however, the operator shall make royalty payments to those mineral owners whose title and ownership interest is not in dispute.

N.D.C.C. § 47-16-39.1 (2009); 2009 N.D. Sess. Laws, ch. 314, § 2.

In Tank II, the court reviewed 47-16-39.1's legislative history. While it is not necessary to repeat all of that discussion here, one point is particularly noteworthy. When § 47-16-39.1 was first enacted in 1961, it provided only for the remedy of lease cancellation. It was not until 1981 that the provisions for recovery of 18% penalty interest as well as attorney's fees and costs were added to provide additional deterrence against the untimely payment of lease royalty. The reason expressed in the legislative history for adding these remedies was that lease cancellation had proved to be an ineffective deterrent because of the unwillingness of the courts to order it save in extreme cases.

## 2.    State law governs the award of attorney's fees and costs for claims made pursuant to § 47-16-39.1

Absent specific law to the contrary, federal procedure follows the "American Rule" in not allowing the prevailing party to recover attorney's fees. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247-60 (1975). However, in diversity cases, attorney's fees are recoverable when state law permits their recovery - at least as a substantive matter. See, e.g., Hortica-Florists' Mut. Ins. Co. v. Pittman Nursery Corp., 729 F.3d 846, 852 (8th Cir. 2013) (citing Alyeska, 421 U.S. at 259 n.31). And, in this case, N.D.C.C. § 47-16-39.1 provides for the recovery of attorney's fees by the "prevailing party."

The question of what law governs the recovery of costs is not as clear. The prevailing view appears to be that a federal court should look to state law in a diversity action when state law makes the recovery of costs part of the substantive relief that can be awarded for a particular claim as opposed to simply providing for costs as a matter of procedure. See, e.g., Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1065-66 (9th Cir. 2003) (citing other cases). In this case, the court construes N.D.C.C.

§ 47-16-39.1 as providing for the recovery of costs as a matter of substantive relief based upon its language allowing for the recovery of "any court costs" as well as the legislative purpose for the fee and cost-shifting provisions.

**B.     Separate treatment for the Lassen and Kings Canyon Well claims**

As noted above, the parties are not the same for the Lassen and Kings Canyon Well claims. While all of the parties are involved in the Lassen Well, only Greggory Tank and Burlington are involved in the Kings Canyon Well claim.   Further, the issues for the two wells are somewhat different.  Notably, lease cancellation was not an issue with respect to the Kings Canyon Well because Greggory Tank's mineral interest with respect to that well was unleased.  Because of these differences, the only way to fairly address the issue of attorney's fees and costs is to treat the claims related to the two wells separately for purposes of any award of attorney's fees and costs pursuant to § 47-16-39.1.

**C.     Attorney's fees and costs related to the Lassen Well part of the litigation**

**1.     Defendants' argument that the Tanks sought only lease cancellation with respect to the Lassen Well; hence, defendants and not the Tanks are the "prevailing party"**

Defendants argue that the Tanks only sought lease cancellation with respect to the Lassen Well and did not request alternative relief in the form of payment of the unpaid royalty and penalty interest pursuant to § 47-16-39.1.  Hence, they contend they are the "prevailing party" within the meaning of § 47-16-39.1 with respect to the Lassen Well, since they prevailed on the issue of lease cancellation, and that, in any event, the Tanks cannot be the "prevailing party."

The court disagrees:

- Paragraph 30 of the Amended Complaint, although falling under the heading of a claim for lease cancellation generally, states that "[t]his action is brought to cancel the lease pursuant to N.D.C.C. § 47-16-39.1, for breach of the express terms of the Murex Lease

7

and breach of Defendant's fiduciary duties to Plaintiffs, *and for correct payments on Plaintiffs' interests*." (italics added).

- The prayer for relief in the Amended Complaint contains the following request for relief:

   2.   Directing Defendants to pay Plaintiffs' statutory royalties and interest as appropriate pursuant to N.D.C.C. §§ 38-08-08 and 47-16-39.1.

Defendants argue this request should be interpreted as applying only to the Kings Canyon Well because of the reference to statutory royalty under § 38-08-08. However, the language on its face is broader and does not foreclose a request for payment of interest under § 47-16-39.1 "as appropriate" that would include payment of penalty interest with respect to the Lassen Well, *i.e.*, it does not state it is limited to the Kings Canyon Well and it refers to "Plaintiffs" and not just Greggory Tank. Further, if the Murex Lease was cancelled, then the royalty that would be due on the Lassen Well would also be statutory interest pursuant to § 38-08-08. Finally, contrary to the argument it makes now, Murex clearly interpreted this prayer for relief as applying to the Lassen Well during the pleading stage of the litigation. This is because it specifically mentioned this request for relief in its counterclaim, and, as noted earlier, Murex was not involved in the Kings Canyon Well part of the litigation.[2]

---

[2]  In ¶ 61 of the its counterclaim, Murex recites the fact that the Tanks brought an action against Murex and Burlington claiming that defendants had wrongfully withheld payment of royalty due under the Murex Lease. The paragraph goes on to allege:

   The Plaintiffs are seeking an order from this court declaring that the failure to pay royalties is a breach of the Lease Agreement, as well as certain fiduciary duties owed to the Plaintiffs by the Defendants, declaring that as a result of said breaches, the Plaintiffs are entitled to cancellation of the Lease Agreement, *and directing the Defendants to pay to the Plaintiffs statutory royalties and interest as appropriate pursuant to N.D.C.C. §§ 38-08-08 and 47-16-39.1, as well as Plaintiffs' attorney's fees and costs.*

(Doc. No. 52, ¶ 61) (italics and underscore added).

8

-     The prayer for relief in the Amended Complaint also includes the catchall request:

> 4.     Directing that Plaintiffs have such other general relief as may be just, together with costs and disbursements.

But, even if the Amended Complaint did not include an alternative request for payment of royalty and penalty interest for the Lassen Well, defendants have argued from the outset that this was the more appropriate remedy over lease cancellation if the court disagreed with their safe-harbor arguments. In addition, the Tanks asked for penalty interest as an alternative remedy in the briefing on the motions for summary judgment and defendants responded on the merits. In fact, not only was the issue fully litigated, the court denied the request for lease cancellation, in part, based on the availability of payment of penalty interest as a more appropriate remedy in this case. Consequently, for this reason also, the court rejects defendants' argument that the only issue in play with respect to the untimely payment of royalty with respect to the Lassen Well was that of lease cancellation. See, e.g. First Union Nat. Bank v. Pictet Overseas Trust Corp., Ltd., 477 F.3d 616, 622-24 (8th Cir. 2007) (concluding that an affirmative defense not pled in the answer was litigated by the parties upon summary judgment); Torry v. Northrop Grumman Corp., 399 F.3d 876, 879 (7th Cir. 2005) (court can resolve issues not raised in the complaint that have been litigated upon summary judgment with the implied consent of the parties); People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 367-68 (4th Cir. 2001); Cruz v. Coach Stores, Inc., 202 F.3d 560, 569-70 (2d Cir. 2000); cf. Farmland Industries, Inc. v. Morrison-Quirk Grain Corp., 54 F.3d 478, (8th 1995) (holding that issue raised during a pretrial conference and in the pretrial order was a "constructive amendment" of the pleadings); but see Flintlock Const. Services, LLC v. Well-Come Holdings, LLC, 710 F.3d 1221, 1227-28 (11th Cir. 2013); Crawford v. Gould, 56 F.3d 1162, 1168-69 (9th Cir. 1995).[3]

---

[3] As indicated by the foregoing cases, the federal circuit courts are split on whether Fed. R. Civ. P. 15(b)

(continued...)

> **2.    Murex's argument that the only claim that can be brought pursuant to §
> 47-16-39.1 is for lease cancellation; hence, defendants and not the Tanks
> are the "prevailing party"**

Murex cites to language in the *current* version of § 47-16-39.1 which states that penalty interest must be paid by the developer when due under the statute "without the requirement that the mineral owner . . . request the payment of interest . . . ."  Murex then contrasts this language with earlier language in the statute that allows for cancellation of the lease "where it is determined by the court that the equities of the case require cancellation."  From this, Murex appears to suggest that § 47-16-39.1 exists only to provide a remedy for lease cancellation; hence, the Tanks cannot be the "prevailing party," since they did not succeed on that issue, and also that defendants are the "prevailing party."

If this is Murex's argument, it clearly has no merit. The obligation to pay penalty interest arises under § 47-16-39.1.  Consequently, any proceeding to enforce the failure to pay penalty interest must necessarily be brought pursuant § 47-16-39.1.  Acoma Oil Corp. v. Wilson, 471 N.W.2d 476, 486 & n.9 (N.D. 1991) (awarding penalty interest pursuant to § 47-16-39.1).[4]

---

[3](...continued)
applies at the summary judgment stage and whether that rule is the last word on the subject of whether issues not raised in the pleadings can be litigated upon summary judgment by "constructive amendment."  See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 676 F.3d 318, 326-27& n.7 (3rd Cir. 2012) (citing cases from the Second, Fifth, Sixth, Seventh, and Tenth Circuits stating Rule 15(b) does apply and cases from the D.C., Ninth, and Eleventh Circuits saying it does not); Ahmad v. Furlong, 435 F.3d 1196, 1203 n.1 (10th Cir.2006) (noting split among the circuits and within some of the circuits).  It does not appear the Eighth Circuit has ruled on the issue with respect to matters not raised in the complaint, but, as noted above, it has addressed the issue with respect to an affirmative defense not pled in the answer.

[4]  Another problem with this argument is that the statutory language stating a mineral owner does not have to make an affirmative demand for penalty interest was not added to § 47-16-39.1 until after the commencement of this case.  That being said, this addition appears to have been one of emphasis only since the statute's language without this addition clearly provided for the accrual of penalty interest as of the 151st day following the first marketing of production of oil or gas without the necessity of a prior demand.

10

Finally, even if Murex intended by this argument to suggest only that lease cancellation is the primary remedy under § 47-16-39.1 and this, somehow, should factor into the determination of who is the prevailing party, there is no support for this argument as well.  Section 47-16-39.1 does not prioritize between the remedies of lease cancellation and payment of penalty interest.  Further, as discussed earlier, the requirement for paying penalty interest was not part of the statute when it was first enacted in 1961 and the reason why it was added in 1981 was because lease cancellation had proved not to be a very effective deterrent against the untimely payment of lease royalty.  In addition, § 47-16-39.1 was amended several times thereafter to make more explicit the statutory requirement for paying penalty interest and to extend it to the untimely payment of *statutory* royalty.  Viewed in this light, the payment of penalty interest at 18% is probably the more important remedy today in accomplishing what clearly is the statute's purpose - providing a "stick" to ensure timely payment of royalty to mineral owners.

> **3.**     **Murex's argument that defendants cannot be subject to liability under § 47-16-39.1 for penalty interest if a claim for lease cancellation has been brought; hence, defendants and not the Tanks are the prevailing party**

Murex contends that the Tanks cannot be a "prevailing party" because they sought lease cancellation as a remedy in this case.  In support of its argument, Murex points to the words "cancellation of the lease is not sought" in the following portion of § 47-16-39.1:

> If the operator under an oil and gas lease fails to pay oil or gas royalties to the mineral owner or the mineral owner's assignee within one hundred fifty days after oil or gas produced under the lease is marketed and *cancellation of the lease is not sought* or if the operator fails to pay oil or gas royalties to an unleased mineral interest owner within one hundred fifty days from initial oil or gas production from the unleased mineral interest owner's mineral interest, the *operator shall pay interest* on the unpaid royalties at the rate of eighteen percent per annum until paid . . . .

(italics added).  Murex's argument here appears to be that, once the Tanks elected to sue for lease cancellation, they could not at the same time make a claim for recovery of penalty interest.

11

While this is one possible interpretation of the statutory language if it is applied as literally as Murex suggests, it is not the only one.  For example, another equally (if not more) plausible interpretation than Murex's (which takes into account other language that Murex ignores) is that penalty interest would not accrue once lease cancellation is sought but recovery could be made for penalty interest that has accrued prior to seeking cancellation of the lease. To illustrate the difference, consider the facts of this case.  Here, the 151st day after the first marketing of oil or gas from the Lassen Well was sometime in April 2010.  At that point, since the lease royalty remained unpaid and the Tanks had not yet sought lease cancellation, penalty interest began to accrue and became due and payable (*i.e.*, "[i]f the operator . . . fails to pay oil or gas royalties . . . within one hundred fifty days after oil or gas produced under the lease is marketed and *cancellation of the lease is not sought* . . . , *the operator shall pay interest* . . . .")*.*  It was not until several months later that the Tanks first took the position that the Murex Lease should be forfeited for the untimely payment of royalty and more than six months later that they actually commenced suit seeking cancellation pursuant to N.D.C.C. § 47-16-39.1.[5]  Under this interpretation, the Tanks could recover the penalty interest that accrued prior to their seeking to cancel the lease even though they did not prevail on the issue of lease cancellation.[6]

---

[5]  As noted in the court's earlier order, the Tanks served Murex with a Notice of Lease Forfeiture pursuant to N.D.C.C. § 47-16-36 on August 4, 2010.  However, this was immediately followed by Murex filing a Notice of Non-Termination of Oil and Gas Lease refusing to release its interest.  In the later part of September 2010, the Tanks orally advised Burlington that they deemed the Murex Lease as having terminated for non-payment of royalty, but it was not until November 2010 that the Tanks commenced this action in state court seeking to cancel the lease pursuant to § 47-16-39.1.

[6]  In fact, under this interpretation, cancellation of the lease would not be inconsistent with the recovery of penalty interest if the cancellation was not retroactive to prior to when lease cancellation was sought.  In other words, one possibility consistent with a literal reading of the statutory language is that a court could cancel the lease retroactive to when lease cancellation was first sought and also award any penalty interest that had accrued prior to that time. The only case this court is aware of where a lease has been cancelled is this court's decision years ago in Imperial Oil.  As reported in the Eighth Circuit's decision on appeal, this court cancelled the lease retroactively but only to when the

(continued...)

Still another very plausible interpretation is that the North Dakota Supreme Court would conclude that what the legislature actually intended by the words "cancellation of the lease is not sought" was simply that penalty interest should not be awarded if the lease was cancelled, but that the legislature did not intend to prohibit a mineral owner from seeking both remedies in the same action and obtaining penalty interest as an alternative remedy.

The court did not reach this issue in its prior order granting partial summary because of Burlington's representation that it had already paid the past due royalty and penalty interest.  In addressing the question now, the court predicts the North Dakota Supreme Court is likely to adopt the latter of the three interpretations set forth above.  In making this prediction, the court gives primary weight to: (1) the remedial purpose of § 47-16-39.1, which is to ensure timely payment of royalty; (2) the fact that § 47-16-39.1 initially provided only for lease cancellation and that the provisions for payment of penalty interest and attorney's fees were subsequently added to provide additional deterrence against late payment of royalty; (3) allowing recovery of penalty interest as an alternative to lease cancellation in the same case better serves the "object sought to be obtained" by the statute; (4) the absence of anything in the legislative history to warrant a contrary conclusion; (5) the negative results that defendants contend would flow from such a construction are overstated, as discussed in detail later; and (6) the likelihood that even mineral developers would favor an interpretation that allows a court to award penalty interest as a less-drastic alternative when lease cancellation is sought. Cf. Roubideaux v. North Dakota Dept. of Corrections and Rehabilitation, 570 F.3d 966, 972 (8th Cir. 2009) (a federal court looks to state law for the law governing the construction of state statutes);

---

[6](...continued)
mineral owner first treated the lease as having been cancelled, even though the lack of payment of royalty had been ongoing for years prior to that time.  Imperial Oil of North Dakota, Inc. v. Consolidated Crude Oil Co., 851 F.2d 206, 210 (8th Cir. 1988).  Further, no one questioned the court's authority in that case to cancel the lease retroactively, but that certainly might be a legitimate issue, at least in some cases.  Of course, if the lease was not cancelled retroactively, then there would be no conflict in awarding both forms of relief under this interpretation of the statute.

Locken v. Locken, 2011 ND 90, ¶ 9, 797 N.W.2d 301 (discussing what a court should look to in construing statutory language that is unclear or uncertain); N.D.C.C. § 1-02-39 (extrinsic aids for construing ambiguous statutes).[7]

> **4.     The remaining arguments for who is the "prevailing party" with respect to the Lassen Well portion of the litigation**

Defendants contend they are the "prevailing parties" premised upon an argument that the Tanks' "primary litigation objective" was lease cancellation and defendants prevailed on that issue. The Tanks, on the other hand, contend they are the "prevailing party" because they obtained relief pursuant § 47-16-39.1, even if they did not succeed as to their preferred remedy.  In addition, there are two other possibilities that the court must consider.  One is a conclusion that nobody was a "prevailing party" as to the Lassen Well claims because both sides prevailed on some issues.  The other

---

[7] In Locken, the North Dakota Supreme Court stated:
  Our primary objective in interpreting a statute is to determine the legislature's intent, and we initially look to the language of the statute to determine intent. [Schmidt v. Gateway Cmty. Fellowship, 2010 ND 69, ¶ 14, 781 N.W.2d 200]. Words in a statute are given their plain, ordinary, and commonly understood meaning, unless they are defined by statute or unless a contrary intention plainly appears. N.D.C.C. § 1-02-02. Statutes are construed as a whole and are harmonized to give meaning to related provisions. N.D.C.C. § 1-02-07. The letter of a statute cannot be disregarded under the pretext of pursuing its spirit when the language of the statute is clear and unambiguous. N.D.C.C. § 1-02-05. "[I]f the language of a statute is ambiguous or of doubtful meaning or if adherence to the strict letter of the statute would lead to an absurd or ludicrous result, the court may resort to extrinsic aids to interpret the statute." Stutsman County v. State Historical Soc'y, 371 N.W.2d 321, 325 (N.D.1985). "'A statute is ambiguous if it is susceptible to different, rational meanings.'" Sauby v. City of Fargo, 2008 ND 60, ¶ 8, 747 N.W.2d 65 (quoting Simon v. Simon, 2006 ND 29, ¶ 12, 709 N.W.2d 4). Section 1-02-39, N.D.C.C., lists extrinsic aids for construing ambiguous statutes:
    If a statute is ambiguous, the court, in determining the intention of the legislation, may consider among other matters:
     1. The object sought to be attained.
     2. The circumstances under which the statute was enacted.
     3. The legislative history.
     4. The common law or former statutory provisions, including laws  upon the same or similar subjects.
     5. The consequences of a particular construction.
     6. The administrative construction of the statute.
     7. The preamble.
2011 ND 90, ¶ 9.

would be to conclude that each party prevailed and award attorney's fees and costs for the issues that they prevailed upon.

Section 47-16-39.1, provides:  "The prevailing party in any *proceeding* brought pursuant to this section is entitled to recover any court costs and reasonable attorney's fees." (italics added).  Here, the Tanks' action against the defendants is clearly a "proceeding" pursuant to N.D.C.C. § 47-16-39.1. And, while the Tanks were not successful in obtaining lease cancellation, they were successful in recovering past due royalty and payment of penalty interest pursuant to N.D.C.C. § 47-16-39.1 as a result of filing this action.  For the reasons set forth below, the court  believes that the North Dakota Supreme Court would conclude this was enough to make the Tanks (and not defendants) the "prevailing party."

Unfortunately, there are no North Dakota cases addressing the issue of when a party should be considered a "prevailing party" under § 47-16-39.1.  In fact, the case law in North Dakota is sparse generally on the question of "prevailing party" in the context of fee and cost-shifting statutes, with most of the cases addressing the question in the context of North Dakota's general cost statutes, such as N.D.C.C. § 28-26-06.  And, there are reasons to distinguish between the two types of statutes. When a statute provides for fee-shifting, additional considerations may come into play in determining who is the "prevailing party," *e.g.*, the remedial purpose of the statute.  Also, the court may have greater discretion in making an award under a fee or cost-shifting statute, *e.g.*, considering the "degree of success" as part of the determination of what fees are reasonable.  Cf. Lowry ex. rel. Crow v. Watson Chapel School Dist. 540 F.3d 752, 763-66 (8th Cir. 2008) ("Lowry") (court should consider the prevailing party's degree of success in determining an award of attorney's fees under the fee-shifting provisions of 42 U.S.C. § 1988(b)); State ex rel. Younger v. Bryant, 465 N.W.2d 155, 160 (N.D. 1991) (district court has substantial discretion in deciding who was the prevailing party for

purposes of an award of costs and attorney's fees in a domestic relations dispute where both parties prevailed on some issues).  Finally, with respect to costs, the prevailing party under a fee and cost-shifting statute may be entitled to additional costs beyond what is normally allowed.  See, e.g., Kilian v. Mercedes-Benz, USA, 799 N.W.2d 815, 828-29 (Wis. 2011).

In this case, the North Dakota Supreme Court would likely conclude that lease cancellation and payment of penalty interest under § 47-16-39.1 are alternative forms of relief for the untimely payment of royalty and that a mineral owner who succeeds in obtaining either is the "prevailing party." This conclusion, while, perhaps, not required by the court's prior precedents discussing who is the "prevailing party" for purposes of an award of costs pursuant to North Dakota's general cost statutes, is not contrary to them.  See Dowhan v. Brockman, 2001 ND 70, ¶ 11, 624 N.W.2d 690 ("The determination of who is a prevailing party ... is based upon success on the merits, not damages."); Lemer v. Campbell, 1999 ND 223, ¶ 9, 602 N.W.2d 686 ("The determination of who is the prevailing or successful party is based upon success upon the merits, not upon damages, and a party may be the prevailing party although he recovers no award of damages.") (citing 20 C.J.S. Costs § 11 (1990)). Further, the court is likely to look beyond these precedents and consider the remedial purposes of § 47-16-39.1 as well as its legislative history.  Allowing recovery of attorney's fees furthers the remedial purpose of the statute to the extent that it makes economically feasible claims for recovery of penalty interest that would otherwise not be economical if the mineral owner had to incur his or her own attorney's fees.  And, perhaps, more significantly, the legislative history suggests that the purpose for including the fee and cost-shifting provision was not to discourage the litigation of weak claims but rather to level the playing field for mineral owners who were viewed as not having the same resources as mineral developers to litigate.   See Hearing on H.B. 1071 Before the House Natural Resources

Committee, 61st N.D. Legis. Sess. (Jan. 16, 2009) (Attachment 2) (testimony of the bill sponsor) (filed at Doc. No. 132-2).

Outside of North Dakota, the only case the court could find close to being on point is Fuller v. Franks Petroleum, Inc., 501 So.2d 1024 (La. Ct. App. 2d Cir. 1987) ("Fuller"). Under somewhat comparable circumstances, the Louisiana Court of Appeals in Fuller awarded a mineral owner his attorney's fees and costs in successfully obtaining payment of royalty and interest even though the mineral owner did not prevail on the issue of lease cancellation.

Also, legislative concerns over leveling the playing field, making economically feasible suits to recover small amounts of money, and the importance of providing an effective deterrent are among the reasons why the United States Supreme Court rejected the use of a "central issue" or "primary relief" test for determining who is the "prevailing party" for purposes of the fee-shifting provisions that apply in federal civil rights cases. Instead, the Court adopted a less-demanding test that allows an award of attorney's fees and costs to a plaintiff who has prevailed on any significant issue that has achieved some of the benefits sought in the action, even if plaintiff did not prevail on other issues. E.g., Farrar v. Hobby, 506 U.S. 103, 109-12 (1992) (discussing the applicable test and summarizing the court's prior precedents) ("Farrar"); Texas State Teachers Ass'n v. Garland Independent School Dist., 489 U.S. 782, 787-92 (1989) (discussing the applicable test and rejecting the use of a "central issue" or "primary relief" analysis); Hensley v. Eckerhart, 461 U.S. 424, 433 (1982) ("Hensley"); see Lowry, 540 F.3d at 763-66; see generally Martin A. Schwartz & John E. Elkin, Section 1983 Litigation Statutory Attorney's Fees § 2.06 (current through 2013-2 Supplement). The North Dakota Supreme Court may very well find the reasoning of these cases instructive here.

While the court concludes that some award of attorney's fees and costs is appropriate given the Tanks' success in recovering penalty interest as the result of having commenced this action, the

court rejects the Tanks' argument that they are entitled to all of their fees and costs.  The North

Dakota Supreme Court is likely to conclude that a court would have substantial discretion in

determining what should be awarded, including consideration of the degree of success obtained, and,

for issues not prevailed upon, to not award fees or costs or to make some appropriate discount.  See

State ex rel. Younger v. Bryant, 465 N.W.2d at 160; cf. Farrar, 489 U.S. at 114-15;  Hensley, 461

U.S. at 433-40; Lowry, 540 F.3d at 763-66; Fuller, 501 So.2d at 1032.

        The Tanks further argue that they are entitled to an award of most of their attorney's fees and

costs because of overlapping issues and other considerations.  While the court will decide what actual

amounts should be awarded at the next stage, the court agrees with defendants that this case would

have been concluded long before now if the Tanks had not persisted with their request for lease

cancellation and contested when penalty interest would first begin to run - issues that they did not

prevail upon.  Consequently, while the court agrees that the Tanks are entitled to *some* fees and costs,

the court will take into account the realities of the litigation.  Instructive with respect to this and the

Tanks' other argument is the following discussion from the Eighth Circuit's decision in Lowry:

> Defendants also argue that because plaintiffs prevailed on only one of the four
> counts in their complaint, the district court should have awarded 25% of fees instead of 50%.
> The district court awarded $37,500 in attorneys' fees, which is approximately one-half of the
> total fees incurred. Defendants' contention that the district court was required to calculate
> the award based on a percentage of counts in the complaint on which plaintiffs' received
> damages lacks precedential support. Instead, our case law has rejected a similar,
> arithmetically simplistic fee-calculation argument. See Wal-Mart Stores, Inc. v. Barton, 223
> F.3d 770, 772 (8th Cir. 2000) (rejecting the argument that because Barton only prevailed on
> one of her six original claims, her fee award of 70% was too high).
>
> In fact, "[t]here is no precise rule or formula for making these determinations. The
> district court may attempt to identify specific hours that should be eliminated, or it may
> simply reduce the award to account for the limited success. The court necessarily has
> discretion in making this equitable judgment." Hensley v. Eckerhart, 461 U.S. 424, 436–37,
> 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The Supreme Court has established:
>
>> [C]ertain principles to guide the discretion of the lower courts in setting fee awards
>> in cases where plaintiffs have not achieved complete success. Where the plaintiff's
>> claims are based on different facts and legal theories, and the plaintiff has prevailed
>> on only some of those claims, we indicated that [t]he congressional intent to limit
>> [fee] awards to prevailing parties requires that these unrelated claims be treated as

18

> if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim. In the more typical situation, where the plaintiff's claims arise out of a common core of facts, and involve related legal theories, the inquiry is more complex. In such a case, we indicated that the most critical factor is the degree of success obtained. We noted that in complex civil rights litigation, the plaintiff often may succeed in identifying some unlawful practices or conditions, but that the range of possible success is vast, and the achievement of prevailing party status alone may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved. We indicated that the district courts should exercise their equitable discretion in such cases to arrive at a reasonable fee award, either by attempting to identify specific hours that should be eliminated or by simply reducing the award to account for the limited success of the plaintiff.

Tex. State Teachers Ass'n, 489 U.S. at 789–90, 109 S.Ct. 1486 (internal citations and quotations omitted).

540 F.3d at 765 (footnote omitted).

Defendants argue that allowing the Tanks to recover attorney's fees and costs would set a dangerous precedent. They contend Burlington conceded payment of past due royalty and penalty interest, leaving only the issues of lease cancellation and when penalty interest would begin to run, both of which they prevailed upon. They then go on to argue:

> On the record here, to deem the Tanks the prevailing party entitled to an award of attorneys' fees and costs would set a dangerous public policy precedent. It would encourage prolonged litigation. Litigants, such as the Tanks, would have no incentive to resolve or end litigation since they would be "playing with house money" - - they could recover their attorneys' fees and costs even if they lost on the issues they continued to pursue.

(Doc. No. 146, p. 6).

Defendants' concerns here - to the extent they have any validity - will largely be taken care of by the court taking into consideration the Tanks' lack of success on the issues they did not prevail upon. Further, there is a certain irony in defendants' argument about the Tanks being able to "play with house money" given that the concern of the legislature in enacting § 47-16-39.1 was that some mineral developers had been playing with the *other house's* money. That is, they were delaying payment of royalty based on the flimsiest of excuses, or no excuse at all, and requiring mineral owners

to sue in order to enforce their lease rights, knowing full well this may cost more than the amount of interest that could be recovered.

Also, defendants in making their argument gloss over the facts that, when this action was filed in November 2010, production from the Lassen Well had been ongoing for a year and only two months of royalty payments had been tendered to the Tanks (one in October and another in November 2010) and these payments did not include the penalty interest due under the statute beginning sometime in April 2010. Further, even with respect to these payments, Burlington was claiming that they had been made in error and both defendants were arguing that the delays in payment were justified by existing "title disputes." It was not until after the court expressed doubt about defendants' safe-harbor arguments that Burlington (to its credit) reassessed the situation and in July 2011 put the Tanks on "pay status."

Finally, defendants in making their "sky-is-falling" argument fail to consider what they could have done differently to avoid the situation that they now find themselves in. There were several points prior to and including when this action was filed that defendants (and particularly Murex) could have paid more attention to the delays in payment of royalty to the Tanks and what § 47-16-39.1 required. For example, when Burlington's title attorney initially raised the issue of the two outstanding mortgages that were superior to the Murex Lease and recommended that subordinations be obtained, Burlington could have communicated with Murex to see whether Murex really cared. Also, when Murex received its Notice of Lease Forfeiture from the Tanks in August 2010, it could have inquired of Burlington what the reasons were for the delay in payment. And, if not at these early points, defendants could have devoted more attention to this matter in September when the Tanks served a similar Notice of Lease Forfeiture upon Burlington and took the position the Murex Lease had been cancelled or even later when the Tanks commenced this action in November 2010. If at any one of

these points Murex had considered the matter in more depth (*i.e.,* focusing in what § 47-16-39.1 required and also asking itself why subordinations were now a concern when it had been paying the Tanks royalty for years on its own well), it likely would have lead to Murex communicating to Burlington that the subordinations were not necessary either because the risks of losing the Murex Lease through foreclosure without being able to take steps to protect against the loss were small compared to losing the lease for non-payment of royalty (*i.e.*, the exercise of some commonsense business judgment) or, more fundamentally, that lease subordinations could not be insisted upon as predicate to payment of the royalty due as the court has so ruled.  In fact, more focused attention to the problem may have led to the discovery of the fact that Murex already had obtained the necessary subordinations some seven years earlier.

If at any one of these points defendants had concluded that the royalty along with penalty interest needed to be paid to the Tanks notwithstanding the superiority of the FCA mortgages (even as late as when this action was filed) and an immediate tender of these amounts was made, then this case truly would have been only about the issues that the Tanks did not prevail upon.  However, this is not what happened.

In summary, the court concludes that the Tanks are the "prevailing party" within the meaning of N.D.C.C. § 47-16-39.1 as to the Lassen Well portion of the litigation since they prevailed upon a significant issue, *i.e.*, recovery of penalty interest, even though they did not prevail on other issues

21

including lease cancellation.[8]  Hence, they will be awarded *some* attorney's fees and costs reflective of their success on this issue.

### 5.    Murex's liability under § 47-16-39.1

Section 47-16-39.1 states that the "operator" must pay penalty interest to the mineral owner when royalty has not been paid within the time specified in the statute.  In its earlier briefing, Murex contended that only Burlington was the "operator, and the court, in its last order, identified this as an issue remaining to resolve.  If Murex was not an "operator" within the meaning of the statute, then it had no obligation to pay penalty interest and the court's award of attorney's fees and costs would be limited to Burlington.

What creates the uncertainty here is that Murex's operating interest was pooled by the Industrial Commission with other interests for purposes of the drilling and operation of the Lassen Well and Burlington was designated the actual operator under the Commission's order.  Further, while it may not make much difference, Murex refused to sign the operating agreement tendered by Burlington.

This is another situation where § 47-16-39.1 is less than clear and there are no North Dakota cases on the subject.  The court's prediction here is that the North Dakota Supreme Court would conclude that Murex was an "operator" in this situation based on the following:  (1)  Murex still possessed the "operating rights" under the terms of its lease with the Tanks; (2) the beginning sentence of § 47-16-39.1 states that the payment of royalty is the essence of the lease and that the

---

[8]  The fact that Burlington decided to start paying the royalty due and apparently some penalty interest after commencement of the action (and most probably because of what the court had to say in its order denying the preliminary injunction) and the fact that the parties later stipulated to the final amounts due does not mean the Tanks were not the "prevailing party" with respect to the payment of some penalty interest.  See, e.g., Scarangella v. Group Health, Inc., 731 F.2d 146, 154-56 (2d Cir. 2013); Kilian v. Mercedes-Benz USA, LLC, 799 N.W.2d 815, 829 (Wis. 2011) (plaintiff prevailed where defendant voluntarily ceased the complained-about collection efforts after the case was commenced).

failure to make payment is a breach of the lease; (3) § 47-16-39.1 clearly permitted cancellation of the Murex Lease for untimely payment of lease royalty, even though Murex was not the actual operator, and this was a more drastic remedy; (4) the likely purpose for the use of the term "operator" was to extend the liability to pay penalty interest to the actual or primary operator in the case of pooled interests and not to relieve the mineral lessee with operating rights from liability; (5) imposing liability on the lessee in this instance serves the "object sought to be obtained" by the statute; (6) Murex likely remained contractually obligated under its lease to pay the royalty due,[9] which, if breached, would have exposed it to payment of interest under N.D.C.C. § 32-03-04 (which normally applies to breaches of contract and which § 47-16-39.1 appears now to have replaced at least in part); (7) Murex had the opportunity of giving up the lease and not continuing to claim its benefits if it did not want to be exposed to liability for penalty interest; and (8) Murex was probably not without its own remedies and, for example, may have had a common law indemnity claim[10] against Burlington if Burlington had the primary responsibility to make timely payment and did not.  See Locken v. Locken, 2011 ND 90, at ¶ 9 (discussing what a court should look to in construing statutory language that is unclear or uncertain); N.D.C.C. § 1-02-39 (extrinsic aids for construing ambiguous statutes); cf. Marla J. Williams, Performance Of The Lease Royalty Clause:  Whose Responsibility Is It?, 33B Rocky Mountain Mineral Law Special Institute 1, 9-10 (April 1993).  However, this a close question and the state legislature should consider amending the statute.

Consequently, the court's award of attorney's fees and costs pursuant to N.D.C.C. § 47-16-39.1 will be assessed against Burlington and Murex, jointly and severally.

---

[9]  Murex has not pointed to any lease language excusing its obligation to pay royalty in this situation.

[10]  Cf. Sayler v. Holstrom, 239 N.W.2d 276, 279-80 (N.D. 1976).

**D.**     **Attorney's fees and costs related to the Kings Canyon Well part of the litigation**

The detailed history with respect to the Kings Canyon Well has been outlined in the court's prior orders and need not be repeated here since it appears that Burlington concedes that the Tanks are the prevailing party with respect to the Kings Canyon Well given that they were successful in obtaining the payment of penalty interest on statutory royalty that had not been paid within the 150 days allowed by § 47-16-39.1.

**III.**     **TANKS' CLAIMS FOR ATTORNEY'S FEES AND COSTS IN DEFENDING AGAINST MUREX'S DISMISSED COUNTERCLAIM**

**A.**     **Background**

As discussed in more detail in the court's earlier orders, Burlington's title examiner had recommended in June 2010 that Burlington obtain subordinations of two mortgages that were superior to the Murex Lease and for which Farm Credit Services ("FCS") was the current mortgagee. Burlington's title examiner also recommended that Burlington obtain a "division order" specifying who, as between the Tanks and FCS, would be entitled to the royalty payments given language in the mortgages that created the possibility that the royalty had been assigned to FCS.

By the time that Burlington obtained its title opinion, the 150-day deadline for paying royalty on the production from the Lassen Well without having to pay penalty interest had gone by.  In fact, the 151st day was sometime in April 2010.  When Burlington obtained its title opinion, it put the Tanks royalty payments in suspense pending resolution of the two issues identified by the title examiner. While this was going on, the Tanks, who were not receiving their lease royalty, served Murex with a Notice of  Forfeiture of the Lease in August 2010, which Murex responded to with a Notice of Non-Termination.  In September, the Tanks served the same paper work upon Burlington and orally advised Burlington that they considered the Murex Lease to have terminated for nonpayment of royalty.

It was also in September that Burlington's land contractor, who had earlier been tasked with

24

doing the curative work for the Lassen Well, made its first attempt to obtain subordinations of the two mortgages from FCS. FCS's response was that it would subordinate its mortgages to the Murex Lease but only if the Tanks consented. Notably, FCS did not respond by stating that subordinations were unnecessary because some seven years earlier it had already subordinated its mortgages to the Murex Lease.

Burlington then approached the Tanks who either would not agree to consent to the subordinations absent additional consideration (according to Burlington) or who were noncommittal because Burlington would not agree that any consent on their part would not be deemed a waiver of their claim for lease cancellation (according to the Tanks). The Tanks then filed this action in state court seeking the relief that has already been described. Thereafter, Burlington made some attempts through counsel to resolve both issues, which never came to fruition with respect to the requested subordinations. Eventually, however, the Tanks' attorney did tender an affidavit from FCS in March 2011 stating that it would agree to the royalty being paid either to the Tanks or to FCS and the Tanks jointly.

In May 2011, Murex sought and was granted leave to assert a counterclaim against the Tanks. In the counterclaim, Murex alleged:

- the existence of the Tanks' mineral interest and Murex' lease interest under the Murex Lease;

- the fact that Murex's lease interest had been pooled for purposes of drilling and operation of the Lassen Well with other interests and Burlington was designated the well operator;

- the fact that an examination of title by Burlington revealed outstanding mortgages to Farm Credit Services (FCS) covering the leased property;

- the fact that the mortgages allowed FCS at is option to receive "all sums which may accrue to the Mortgagors . . . from the sale, lease, development or removal of minerals in and under the premises[;]"

- the fact that Burlington's title examiner advised Burlington it should obtain a subordination of the mortgages from the mortgagee;

- the Tanks' alleged refusal to consent to FCS's subordination of the mortgages;

- the service by the Tanks upon Murex of a Notice of Lease Forfeiture and Murex's service in response of a Notice of Non-Termination of the Murex Lease;

- the fact the Tanks had commenced this action against Murex and Burlington claiming they had wrongfully withheld payment of royalty and breached their fiduciary obligations and seeking to cancel the Murex Lease and obtain payment of statutory royalties and interest.

Based on these allegations, Murex went on to claim the following:

62

The Plaintiff's refusal to cooperate in the subordination of certain mortgages against their interest in the mineral estate and in and under the Subject Property, as well as their efforts to cancel the Lease Agreement based on their own wrongful actions constitute a breach of the Lease Agreement with Murex.

63

As a result of the Plaintiffs' breach of the Lease Agreement with Murex, Murex has suffered and continues to suffer damages in an amount to be determined at trial.

(Doc. No. 52, p.p. 12-15).

In June 2012, when responding to discovery requests served by the Tanks a month earlier that requested information about curative work undertaken by Murex with respect to the Tanks' property, Murex discovered the subordinations of the mortgages that it had obtained some seven years earlier when it drilled its own well, the "Tank 12-25 Well," on the Murex Lease acreage in

2003.  The subordinations were sitting in the well file for the Tank 12-35 Well.  The reason why Burlington's title examiner was unaware of their existence was because the subordinations had never been recorded.

Immediately upon discovery of the subordinations, Murex's counsel forwarded them to the attorney for the Tanks, and, thereafter, attempted to obtain a stipulation to dismissal of the counterclaim.  When the Tanks would not agree to dismissal without payment of attorney's fees and costs, Murex moved to dismiss the counterclaim, which the court granted but left open the issue of attorney's fees and costs.

### B.    The Tanks' claim for attorney's fees and costs under N.D.C.C. § 28-26-01 related to Murex's dismissed counterclaim

#### 1.    Introduction

The Tanks argue they are entitled to attorney's fees and costs pursuant to N.D.C.C. § 28-26-01(2).  The court, however, has serious doubts over its authority to award fees and costs pursuant to this statute.  But, because neither party has addressed the issue, the court will address first the merits of the Tanks' argument since the court's ultimate conclusion is that the Tanks are not entitled to an award even if the statute does apply.  This will be followed by a brief discussion about the fact that, even if the court found liability, it would likely not have much, if any, impact on the ultimate award of fees and costs in this case. Finally, the court will address briefly why it believes its authority to make an award of fees and costs under § 28-26-01(2) is doubtful.

#### 2.    N.D.C.C. § 28-26-01(2) and its requirements

The Tanks argue that Murex should be held liable for attorney's fees and statutory costs pursuant to N.D.C.C. § 28-26-01(2) on the grounds there was a complete absence of facts or law supporting its counterclaim.  In relevant part, § 28-26-01(2) reads as follows:

2.  In civil actions the court shall, upon a finding that a claim for relief was frivolous, award reasonable actual and statutory costs, including reasonable attorney's fees to the prevailing party. Such costs must be awarded regardless of the good faith of the attorney or party making the claim for relief if there is such a complete absence of actual facts or law that a reasonable person could not have thought a court would render judgment in that person's favor, providing the prevailing party has in responsive pleading alleged the frivolous nature of the claim. This subsection does not require the award of costs or fees against an attorney or party advancing a claim unwarranted under existing law, if it is supported by a good-faith argument for an extension, modification, or reversal of the existing law.

What is notable about § 28-26-01(2) is that bad faith is not a prerequisite to recovery[11] and mere frivolousness (*i.e.*, a complete absence of either facts or law) will support an award.[12] E.g., <u>Napoleon Livestock Auction, Inc. v. Rohrich</u>, 406 N.W.2d 346, 357 (N.D. 1987).   Also, an award of fees and costs is required if the court determines frivolousness, subject to the safe harbor provision in the last sentence.  <u>Strand v. Cass County</u>, 2008 ND 149, ¶¶ 12-13, 753 N.W.2d 872 ("<u>Strand</u>").  In other words, while the court has some discretion in determining whether the claim for relief is frivolous, it must award fees and costs once the determination of frivolousness has been made.  <u>Id.</u>

The North Dakota Supreme Court has described a court's obligation in considering a request for attorney's fees and costs under § 28-26-01(2) as follows:

The court must first determine whether a claim is frivolous, and if it is, then the court must award reasonable attorney's fees to the prevailing party. <u>Wolt v. Wolt</u>, 2011 ND 170, ¶ 25, 803 N.W.2d 534. The court has discretion in deciding whether a claim is frivolous and in deciding the amount and reasonableness of an award. <u>Id.</u> at ¶ 26. The court's decision will not be reversed on appeal unless the court abused its discretion. <u>Id.</u> A court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, when the court misinterprets or misapplies the law, or when its decision is not the product of a rational mental process leading to a reasoned determination. <u>Id.</u> " 'Frivolous claims are those which have such a complete absence of actual facts or law that a reasonable person could not have expected that a court would render judgment in [that person's] favor.' " <u>Id.</u> (quoting <u>Deacon's Development, LLP v. Lamb</u>, 2006 ND 172, ¶ 12, 719 N.W.2d 379).

---

[11]  This is in contrast to N.D.C.C. § 28-26-31 which provides for recovery of attorney's fees and costs for allegations and denials in pleadings that were made without reasonable cause, not in good faith, and that were untrue.

[12]  Before liability for attorney's fees and costs can be imposed pursuant to N.D.C.C. § 28-26-01(2), the party seeking recovery must have asserted in a responsive pleading that it considered the claim to be frivolous.  The Tanks did so in their answer to the counterclaim.  (Doc. No. 54).

<u>Barrett v. Gilbertson</u>, 2013 ND 35, ¶ 25, 827 N.W.2d 831.  What is unclear from the language § 28-26-01(2), however, is whether the court is to make the determination of whether the claim was frivolous from the perspective of when it was made or whether the court must consider the matter retrospectively.  Also, unclear is the relationship between the obligations of the statute and the ability of a party under both federal and North Dakota procedural rules to allege facts based upon "information and belief."  <u>See</u> Fed. R. Civ. P. 11(b)(3); N.D. R. Civ. P. 11(b)(3).

One possible construction of the statute in view of the "complete absence of *actual* facts" language (italics added) is that it shifts the economic burden of having to defend against claims where it turns out there was a complete absence of supporting facts to the party initiating the claim, regardless of how reasonable the assumption may have been by the party pleading the facts that they could later be proven.  Another possible interpretation, however, consistent with the ability to plead unknown facts, is that there would be no liability if the assumption that the supporting facts could later be proved was reasonable at the time it was made.

Without explicitly so stating, it appears that the North Dakota Supreme Court has adopted the latter interpretation, *i.e.*, the determination of whether a claim is frivolous should be made from the perspective of the pleader at the time it was asserted, but subject to the continuing obligation of a party to abandon the claim if it later becomes apparent there is no basis for it.  <u>See</u> <u>Strand</u>, 2008 ND 149, ¶ 11 ("[a]uthorizations of attorney's fees for frivolous claims are not meant to chill enthusiasm and creativity in pursuing *factual* or legal *theories*, and a court should not use the wisdom of hindsight to determine whether claims are frivolous.") (italics added); <u>Peterson v. Zerr</u>, 477 N.W.2d 230, 236 (N.D. 1991) ( the intent of § 28-26-01(2) "is to deter the pursuit of wholly groundless and meritless claims, not to punish inartful drafting"); <u>Napoleon Livestock</u>, 406 N.W.2d at 357-59 (imposing liability under § 28-26-01(2) but only after the party had persisted in the claim after discovery revealed there was no

basis for it).  Further, it appears the court has applied a "reasonableness" test for determining when a party should be held liable under § 28-26-01(2).  <u>See</u>  <u>Napoleon Livestock</u>, 406 N.W.2d at 357-59. And, given the language of the statute that imposes liability notwithstanding the good faith of the party asserting the claim, it appears the determination of reasonableness must be done on an objective basis. This would be comparable to the test adopted by the United States Supreme Court for determining frivolousness under Fed. R. Civ. P. 11.  <u>Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.</u>, 498 U.S. 533, 551 (1991) ("<u>Business Guides</u>") (adopting an "objective reasonableness" test).

> ### 3. Murex's counterclaim was not frivolous as a matter of fact or law within the meaning of § 28-26-01(2) at the time it was asserted

The Tanks primary argument under § 28-26-01(2) is that there was a complete absence of actual facts to support Murex's counterclaim since Murex actually possessed the subordinations that it alleged in the counterclaim were necessary.  Murex disagrees, stating there were other facts.  In addition, Murex contends that its failure to discover the subordinations prior to initiating the counterclaim was not unreasonable given that they had been procured years earlier in connection with the Tank 12-25 Well and were located in the file for that well.

In reviewing the counterclaim, it does appear there were other facts that had a bearing on the claim Murex was attempting to assert.  In particular, Murex pointed to (1) the fact that the FCS mortgages were superior in time to the Murex Lease, (2) the language in the mortgages that Murex alleged created a problem for its lease, and (3) the fact that Burlington had obtained a title opinion and that its attorney had recommended that subordinations be obtained.  While this is probably enough to warrant the conclusion that there was not a complete absence of facts when the counterclaim was asserted, what makes this a close case for liability under § 28-26-01(2) is the fact that Murex actually possessed the subordinations that were the *sine qua non* of the claim Murex was attempting to assert.

The parties have not cited to any North Dakota cases addressing what should happen under § 28-26-01(2) in this type of situation in terms of whether the court can consider the reasonableness of the party not being aware of information already in its possession or whether the court must simply hold the party strictly responsible for it.  However, there are cases in the Rule 11 context where courts have considered the reasonableness of a party's failure to consider information already in its possession.  E.g., Monterey Development Corp. v. Lawyer's Title Ins. Corp., 4 F.3d 605, 610 (8th Cir. 1993) (Rule 11 violated when a reasonable investigation by counsel would have uncovered conduct of his client that undermined his client's claim); Lloyd v. Schlag, 884 F.2d 409, 412 (9th Cir. 1989) (applying the "objectively reasonableness" test and concluding that  Rule 11 was violated based on the attorney's failure to make sufficient inquiries of his client that would have uncovered the information that rendered the claim inoperative).  The court believes that the North Dakota Supreme Court would take a similar approach, keeping in mind that a party may be a large organization (*e.g.*, General Motors or the State of North Dakota) and the obvious difficulty in having present awareness of everything that has gone within the organization, much less in the distant past.

Turning then to the reasonableness of Murex not having located and considered the subordinations in its files prior to bringing the counterclaim, Murex suggests that its failure to check the Tank Well file for information that might possibly have been relevant was reasonable given that the file was for a different well that had been drilled years earlier.  However, there was more out there than simply the subordinations sitting in the Tank Well file gathering dust, so to speak.  There was also the fact that Murex had been producing oil for a number of years from the Tank 12-35 Well under the Murex Lease and paying the Tanks royalty.  Consequently, in the court's view, the question of objective unreasonableness comes down to (1) whether someone from Murex's management should have thought about why subordinations were needed for the Lassen Well in light of the production

31

from its own well and payments to the Tanks, prior to authorizing the counterclaim, and (2) the likelihood that, if someone had thought about the existing lease, the subordinations would have been discovered.

In considering the circumstances that existed when the counterclaim was asserted, the court notes:

- The Lassen Well was drilled some seven years after the Tank 12-35 Well and was not Murex's well.  Rather, Burlington drilled the well after securing approval from the Industrial Commission for a large two-section unit that pooled together a number of lease interests and mineral acres including those of Murex and the Tanks, and Burlington was the actual well operator.

- Burlington, as the actual well operator, had the responsibility for determining how the production was to be divided and at least the initial, if not primary, obligation to make timely payments of royalty interests.

- At the point when Murex became aware of the reasons why Burlington had not yet been making payments of royalty to the Tanks and was holding the money in suspense, Murex also learned (1) Burlington had obtained a title opinion in which its title attorney had recommended that subordinations be obtained from FCS for the Murex Lease, (2) Burlington had attempted to obtain the subordinations from FCS and was told that they would be provided if the Tanks consented, and (3) the Tanks had so far not given their consent, but the matter was in some state of flux.  Further, that situation continued up to the point when the counterclaim was asserted, although the positions of the parties became more fixed with their arguments over the Tanks' request for preliminary relief.

32

It was against this backdrop that the management person from Murex responsible for this matter testified it did not occur to him to consider what Murex had required with respect to its earlier well.

Given that Burlington had primary responsibility for payment of the royalty, that its attorney had recommended subordinations be obtained, and that FCS was in agreement if the Tanks consented, the balance tips ever so slightly in favor of Murex that the failure to consider the situation with respect to its own well was not objectively unreasonable. In particular, one might reasonably have assumed that, if there had been subordinations, they would have been picked up in the title examination performed by Burlington's attorney and/or that FCS would have pointed that out. Further, even if some thought had been given to the Tank 12-35 Well, the management person could have simply assumed that subordinations had not been obtained for that well because (1) an attempt had been made to obtain them and either FCS refused or Murex ran out of time and went without them, (2) Murex decided to take the risk with respect to the Tank Well and did not pursue them, or (3) it was simply matter of oversight. Finally, as already observed, it appears FCS was also not aware that it had previously subordinated its mortgages to the Murex Lease.

The Tanks also assert that the counterclaim was frivolous as matter of law. This also is a close question given that it is somewhat difficult to ascertain the legal basis for the relief being sought. That is: Is the claim one for breach of a covenant against encumbrances? A claim for breach of warranty of quiet possession? A claim for breach of an implied duty to cooperate under the lease? A contractual claim for attorney's fees and costs? Or, is the counterclaim an attempt to plough new ground? The counterclaim does not say. However, given the circumstances, the court is not prepared to say there was a complete absence of law supporting the counterclaim keeping in mind the North Dakota Supreme Court's admonition that the purpose of § 28-26-01(2) is not to penalize inartful drafting or to chill enthusiasm and creativity in pursuing legal theories.

33

In short, given the muddled situation that existed at the time the counterclaim was made, the court concludes it was not so lacking in law and supporting facts that it was frivolous within the meaning of  § 28-26-01(2).  Cf. Napoleon Livestock, 406 N.W.2d at 361-62.

    **4.**  **Even if the court concluded the counterclaim was frivolous, it likely would not make a significant difference with respect to the fees and costs that would be awarded**

Murex discovered the subordinations in the process of responding to the Tanks' initial written discovery requests.  When they were found, Murex's counsel immediately advised the Tanks' counsel that Murex was abandoning the counterclaim.  This appears to have been prior to any of the depositions being taken in this case and, in any event, prior to all of the summary judgment briefing. Further, the counterclaim was not the subject of any of the briefing on the Tanks' motion for preliminary injunction since it was asserted after that briefing had been completed and just before the court ruled on that motion.

Consequently, any attorney's fees and costs that the court might be inclined to award the Tanks if it concluded that the counterclaim was frivolous would not be great and, for the most part, would either be subsumed in the award of fees and costs that the court will make to the Tanks pursuant to N.D.C.C. § 47-16-39.1 or excluded because the fees and costs, even if marginally related to defending against the counterclaim, were primarily directed to proving up the claim for lease cancellation for which fees and costs will not be awarded.

    **5.**  **Whether the court has the power to award attorney's fees and costs pursuant to N.D.C.C. § 28-26-01(2)**

Finally, there is a substantial question whether the court has the authority to award fees and costs pursuant to N.D.C.C. § 28-26-01(2), particularly given the Supreme Court's decision in Burlington Northern R.R. Co. v. Woods, 480 U.S. 1 (1987).  In that case, the Supreme Court held that an Alabama statute imposing a penalty on frivolous appeals encroached upon the subject matter

34

covered by Fed. R. App. P. 38, and, since the federal rule was procedural and satisfied the statutory constraints of the Rules Enabling Act (28 U.S.C. § 2072), the Alabama statute had no application in federal diversity actions.

If Burlington is still good law (which appears to be the case), it is difficult to see how a different conclusion could be reached here.  See also Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co., 559 U.S. 393  (2010) (citing Burlington when concluding that a New York law prohibiting class actions in suits seeking penalties or statutory minimum damages was in conflict with Fed. R. Civ. P. 23 and that Rule 23 controlled since it was valid under the Rules Enabling Act); Chambers v. NASCO, Inc., 501 U.S. 32, 51-55 (1991) ("Chambers"); but cf. Kelly v. Golden, 352 F.3d 344 (8th Cir. 2003).  The Supreme Court has held that Fed. R. Civ. P. 11's provisions addressing frivolous pleadings are procedural and not prohibited by the Rules Enabling Act.  Business Guides, 498 U.S. at 551-54; see Shady Grove, 559 U.S. at 407-08.  And, the North Dakota Supreme Court has stated that § 28-26-01(2) covers the same subject matter as N.D. R. Civ. P. 11, which is virtually the same as Federal Rule 11.  Napoleon Livestock, 406 N.W.2d at 361.

That being said, courts recently have reached contrary conclusions regarding the applicability of similar state statues in diversity cases.  Compare Anaqua, Inc. v. Schroeder, No. 12-10710, 2013 WL 1412190, at *2 & n.1 (D. Mass. Apr. 5, 2013) (holding that Fed. R. Civ. P. 11's provisions with respect to frivolous claims precluded an award pursuant to a state statute covering the same ground) with Blom v. Floodsuckers, LLC, No. 3:12-cv-570, 2013 WL 3463260, at *3 (D. Nev. July 9,  2013) (applying Nevada's statute).

    **C.**    **The Tanks' request for attorney's fees and costs pursuant to federal law**

        **1.**    **The Tanks' request for costs pursuant to Fed. R. Civ. P. 54(d)**

The Tanks argue they are entitled to costs pursuant to Fed. R. Civ. P. 54(d) because they are the prevailing party with respect to the dismissed counterclaim.[13] Given the circumstances of this case, the court agrees the Tanks are the prevailing party.  Further, the court does have the discretion to award costs that are fairly attributable to the counterclaim.  Kellogg v. Nike, Inc., No. 8:07-cv-70, 2010 WL 323994, at *4 (D. Neb. Jan. 20, 2010)  (awarding costs to the party that prevailed on the counterclaim); Executive Air Taxi Corp. v. City of Bismarck, North Dakota, No. 1:04–cv–56, 2006 WL 3544386, at *3 (D.N.D. Nov. 7, 2006) (same).  However, the costs that the court can award pursuant to Rule 54(d) are those enumerated in 28 U.S.C. § 1920 absent the applicability of a cost-shifting statute.  E.g., Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441–42 (1987); Little Rock Cardiology Clinic PA v. Baptist Health, 591 F.3d 591, 601 (8th Cir. 2009).  And, in this case, it appears unlikely that there will be any. Consequently, the court will defer final consideration of this point until it sees what costs are claimed and whether the court in its discretion believes an award should be made.

### 2.    The Tanks' argument for attorney's fees and costs under 28 U.S.C. § 1927

The Tanks argue that the Murex's counsel should be held personally liable for the attorney's fees and costs in defending against the counterclaim pursuant to 28 U.S.C. § 1927, which reads as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and

---

[13]  The court understands the Tanks' request pursuant to Rule 54(d) to be limited to the recovery of costs exclusive of attorney's fees. However, even if the court is mistaken, it would not make a difference. Rule 54(d) follows the "American Rule" in requiring that each party bear their own attorney's fees absent some other basis for shifting fees. Fed. R. Civ. P. 54(d) ("Unless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed the prevailing party."). The only exception would be if the court was to conclude that Murex had acted in bad faith in asserting the counterclaim and the court, in its discretion and pursuant to its inherent power to control the proceedings before it, concluded an award of attorney's fees was appropriate under what is sometimes referred to as the "bad faith" exception to the "American Rule." E.g., Chambers, 501 U.S. at 45-47 (federal court may award attorney's fees when a party has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons"); Kelly v. Golden, 352 F.3d at 352. In this case, the court does not believe that Murex asserted the counterclaim in bad faith. Essentially, the reasons are the same as those set forth earlier for the court's conclusion that the counterclaim was not frivolous (albeit that being a much closer question).

> vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

In order for the court to make an award of fees pursuant to this statute, the mere frivolousness of a pleading is not enough, the statutory language makes clear that the conduct must have been both unreasonable and vexatious, which necessitates "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." Mercury Air Group, Inc. v. Mansour, 237 F.3d 542, 549 (5th Cir. 2001) (internal quotations and citation omitted).

In this case, the court concludes that the Tanks have failed to make the showing required for the imposition of fees pursuant to § 1927.   In fact, the court's view is that the conduct of Murex's counsel has at all times been well within the bounds of permissible zealous advocacy.  With respect to the subordinations, counsel was justified in relying upon the information (or more properly the lack thereof) provided by her client.  Further, when Murex did find the subordinations, counsel immediately disclosed their existence, advised opposing counsel that Murex was abandoning the counterclaim, and sought to effectuate its dismissal.

## IV.   PROBLEMS OF ALLOCATION

Going forward, the court's task of determining what amounts should be awarded will not be an easy one.  Trying to sort out for each expenditure of time or cost what bucket or buckets of recoverable fees or costs the items may fall into, all or in part, is likely to be impossible task, and the court may very well make some overall percentage determinations.  See, e.g., Warnock v. Archer, 380 F.3d 1076,1078 (8th Cir. 2004) (upholding trial court's reduction of plaintiff's fee request by 50% for plaintiff not having prevailed upon other claims); Wal-Mart Stores, Inc. v. Barton, 223 F.3d 770, 772-74 (8th Cir. 2000) (upholding trial court's 20% discount of fees after certain adjustments for lack of success on other issues); Roemmich v. Eagle Eye Development, LLC., No. 1:04–cv–079, 2006 WL 2620373, at *2 (D.N.D. Sept. 15, 2006) supplemented 2006 WL 3833433, at *4 (D.N.D. Dec. 29,

2006) (reducing by 25% the fee award to defendants under a fee-shifting statute because of defendants' failure to prevail on all of their claims and the limited success of plaintiff on certain issues).[14]  The parties are encouraged to try to settle the amounts to be paid in accordance with this court's order, even if the parties reserve their right to contest liability for the amounts later in the event of an appeal.

## V.   CONCLUSIONS AND ORDER

Based on the foregoing, the court concludes and orders as follows:

1.   The Tanks motion for attorney's fees and costs (Doc. No. 141) is **GRANTED IN PART AND DENIED IN PART** as follows:

   a.   The Tanks are the "prevailing party" for purposes of their claim against the defendants pursuant to N.D.C.C. § 47-16-39.1 for penalty interest on the untimely payment of lease royalty on the production from the Lassen Well. The Tanks will be awarded *some* of their attorney's fees and costs  pursuant to § 47-16-39.1 for having prevailed on that issue against both Burlington and Murex, jointly and severally.

   b.   Greggory Tank is the "prevailing party" with respect to his claim pursuant to N.D.C.C. § 47-16-39.1 for penalty interest on the untimely payment of lease royalty on the production from the Kings Canyon Well.  Greggory Tank will be awarded appropriate attorney's fees and costs for his having prevailed on that issue against Burlington.

   c.   The Tanks are the "prevailing party" within the meaning of Fed. R. Civ. P. 54(d) with respect to the dismissed counterclaim, but the court will defer a

---

[14]  The citation to these cases is only to show examples of where courts have made adjustments to fee and cost awards on a percentage basis and not to suggest that the percentages in the cases cited are necessarily appropriate here.

determination o whether any costs will be awarded until the court sees what costs are being claimed.

       d.      The remainder of the Tanks' requests for attorney's fees and costs are denied.

2.      Defendants' motions for attorney's fees and costs (Doc. Nos. 144 & 148) are **DENIED**.

3.      The Tanks shall file on or before December 6, 2013, the amounts that they are seeking in attorney's fees and costs consistent with the above determinations in accordance with the requirements of Local Civil Rule 54.1 (including the filing of a verified statement of fees and expenses along with supporting documents).  Absent further order from the court, any objections and alternative calculations shall be filed on or before December 20, 2013, and any reply on or before December 27, 2013.

Dated this 22nd day of November, 2013.

                      */s/  Charles S. Miller, Jr.*
                      Charles S. Miller, Jr.
                      United States Magistrate Judge